FRANK E. YOUNG, FOR THE USE AND BENEFIT OF OLE JOHNSON-
BOSTROM V. C. O. ENGDAHL.

Opinion filed November 20, 1908.

Rehearing denied January 15, 1909.

**Quieting Title — Adverse Claims — Burden of Proof.**

1. In an action to determine adverse claims to real property, the
burden is upon plaintiff to establish his title as alleged, where such
title is put in issue by the answer.

**Quieting Title — Adverse Claims to Lands — Evidence.**

2. Plaintiff claims title to the real property in controversy under
a certain quitclaim deed claimed to have been executed and delivered
by one Frank E. Young, who concededly was the owner. The original
deed, as well as all correspondence relating to the transaction, is
claimed to have been lost or destroyed, and plaintiff's sole proof of
the execution and delivery of such quitclaim deed consisted of Ex-
hibit A, being a transcript of a record in the office of the register
of deeds purporting to be the record of a quitclaim deed executed by
one Frank E. Young to him. *Held,* that the introduction of such
exhibit merely proved a prima facie case for plaintiff, the presump-
tion of law being that the original, of which Exhibit A is a copy,
is the genuine deed of Frank E. Young; but *held,* further, that such
prima facie case is completely overthrown and disproved by the other
evidence in the record, which clearly shows that the Frank E. Young,
who owned the property, did not execute a quitclaim deed.

Appeal from District Court, Burleigh county; *Winchester, J.*

Action by Frank E. Young, for the use of Ole Johnson-Bostrom,
against C. O. Engdahl. Judgment for plaintiff, and defendant ap-
peals.

Reversed.

*F. H. Register* and *Newton & Dullam,* for appellant.

*R. N. Stevens* and *A. J. Hedrix,* for respondent.

FISK, J. This is the statutory action to determine adverse claims
to real property. Plaintiff had judgment in the court below, and de-
fendant appeals, and asks for a trial de novo of the entire case in
this court.

Plaintiff's alleged title to the real property in controversy is put
in issue by the answer, and the important question for decision is
whether a certain purported quitclaim deed under which plaintiff

asserts ownership is the genuine deed of one Frank E. Young, who concededly had the fee-simple title thereto. It is, of course, plain that, in order to maintain the action, it is incumbent on plaintiff to prove his title as alleged in the complaint. Conrad v. Adler, 13 N. D. 199, 100 N. W. 722. Has he done so? A proper answer to this question necessitates a consideration of the testimony.. Plaintiff's sole proof that he acquired the title from Young consists of Exhibit A, which is a certified transcript of the record in Book 48 of Deeds, at page 566, in the office of the register of deeds of Burleigh county. Such record discloses a purported quitclaim deed of the land in controversy from one Frank E. Young to plaintiff, dated September 5, 1904, and acknowledged before one Lillian R. Noll, a notary public in and for Cook county, Ill., on September 8, 1904. The consideration recited is $50. The residence of the grantor is not disclosed, nor is his signature attested by any witness. The notary's certificate of acknowledgment recites that, "Before me personally appeared Frank E. Young, known to me to be the same person described in, and who executed the within instrument, and acknowledged to me that he executed the same;" but by her testimony it clearly appears that she did not personally know such grantor, and had no recollection of having taken such acknowledgment. She testified, however, that it was her custom not to take acknowledgments unless she personally knew the person whose acknowledgment she took, or he was introduced by a person whom she did know. The original deed was not produced, and it is claimed to have been lost. Plaintiff's title is clearly dependent upon the genuineness of the purported deed as that of the owner, Frank E. Young. The introduction of Exhibit A serves merely to prove a prima facie case in plaintiff's favor, resting upon the well-recognized presumptions of law that the deed and certificate of acknowledgment are, what they purport to be, genuine and valid, and that there was no fraud or forgery perpetrated in the transaction. We shall assume for the purposes of this case that, in order to overcome these presumptions, defendant's proof must be of a clear, satisfactory, and convincing character.

Tested by such rule, is the plaintiff's prima facie case overthrown when the entire evidence is considered in the light of all the facts and circumstances surrounding the transaction as shown by the record? The uncontradicted evidence is that at and for many years prior to the commencement of the action defendant was, with

plaintiff's knowledge, in the exclusive possession of the premises as lessee of the owner, Young, or by virtue of an alleged tax title, cultivating and improving the same; that he was personally acquainted with Young, and had carried on a correspondence by mail with him up to January 23, 1899, at which date he wrote and mailed his last letter to him, receiving no reply thereto; that since said date defendant made many efforts both by letters and by employing the assistance of other persons whom he had reason to suppose might furnish information as to Young's whereabouts, but all such efforts were without avail. On the other hand, the undisputed evidence discloses that neither the plaintiff nor any of the persons, Hedrix, Knauss, or Bull, who were instrumental in procuring the purported deed in question, had any personal acquaintance with Young, or had ever known or met him. It is a significant fact that the original deed is claimed to have been lost, and could not be produced for inspection at the trial, as well as certain letters claimed to have been received by Hedrix from Young; he claiming that such correspondence had been destroyed. This witness knew that litigation must follow the purchase of this property by plaintiff, and he claims to have had a contract with plaintiff to institute such litigation against the defendant for his services, in which litigation he was to receive the sum of $400, yet he was so careless as to permit the original deed to become lost and the letters claimed to have been received from Young relating to the transaction to be destroyed. Hedrix knew, or had reason to suspect, that defendant was in possession of letters and signatures of Young, which is an important fact to weigh in connection with the pretended loss of the original deed as well as the destruction of the correspondence relative thereto. The uncontradicted testimony is to the effect that in 1892 Young held the property at $500, and was willing to take $1 per acre rental. In 1890 and in 1895 he wrote defendant, fixing a price at $5 per acre or $600 for the 120 acres. Hedrix testified that Young wrote him from Idaho, offering to give him a deed for $100, but that he was never able to locate him thereafter, but, according to the testimony of the witnesses Bull and Knauss, they obtained the deed, of which Exhibit A is a copy, at Chicago for the paltry sum of $25, although the consideration recited in the deed as before stated was $50. The lowest value placed upon the land in 1904 by the various witnesses as to its value is $10 per acre, or $1,200. This is a very material fact tending to show the utter improbability

that Young parted with his title for the insignificant sum testified to by plaintiff's witnesses. The very unusual, and to our minds suspicious, circumstances surrounding the alleged execution and delivery of the deed by Young, can be best understood by a brief review of the testimony.

Witness Hedrix testified that, some four or five months before the commencement of the action, he was employed by plaintiff Bostrom to procure title to the land, and he called upon the firm of Bull & Knauss, real estate men in Bismarck, to assist him in getting the title, and they used means to locate Young, and finally succeeded in locating him at a place in Idaho. When asked why he did not get the deed then, he replied: "When I wrote for the deed, I wanted to see Mr. Bostrom to see whether he would pay for it." Witness claims to have received a letter from Young sent from Idaho, but says the letter was destroyed, as he did not deem it of any consequence. He testifies that, after receiving Young's letter, he made out a deed and forwarded it to him, but the same was returned, and he has never been able to locate Young since. The witness admitted that at the time of the trial he was under sentence to the penitentiary for a crime for which he had been convicted, but the nature of the crime is not disclosed.

Plaintiff Bostrom testified that he was acquainted with the rental value of the land in controversy, and in 1905 such rental value was about $500, and in 1904 about $250, and in the years 1896, 1897, 1898, 1899 and 1900 it was about $100; yet he claims to have purchased the land for the sum of $100. He says he read the deed, but cannot say whether, when he first saw it, the grantee's name therein was blank or not.    ,

Witness Knauss testified that Hedrix spoke to Bull and him about getting a deed to this land some time in the spring or early part of the summer of 1904, and that he carried on correspondence with parties in Washington, Idaho, and Montana with reference to locating Young and procuring a deed to the land in question, but he kept no copies of the letters sent by him, but that the letters received were kept and filed away in the office of Bull & Knauss, the same as other correspondence. He then testifies to getting the deed in question from Chicago. When asked how he knew there was anybody by the name of Frank E. Young in Chicago, he replied: "My recollection is that we received a letter from him at some place out in Idaho, saying that he would be there in Chicago, or that

he was then going to Chicago. We had previously sent a deed in blank for execution. Q. And without any grantee named in it? A. I would not say positively as to that. I do not recollect whether there was or not; but our habit in such cases was to leave it blank." He admits having no knowledge that the Frank E. Young who professed to sign the deed was the same Frank E. Young who owned the land. He merely knows that he received a deed from some person by the name of Frank E. Young, and the same was sent from Chicago. Witness says: "I think it was $25 we paid for the deed. * * * We had previously sent the deed for execution." Witness was asked the following question: "Mr. Knauss, where was the man by the name of Frank E. Young when you first found him? A. He was at a town, as I remember it, in northern Idaho." Witness testified to the receipt of a letter from Frank E. Young, or F. E. Young, written at Kootenai, Idaho, but does not know where the letter now is, and he prepared the deed and sent it out to him at said place, and he says this same deed is the one received from Chicago and came in answer to his letter written to Kootenai, Idaho. Witness also says that, according to his best recollection, when received, the deed was blank as to the grantee's name, and he thinks that he afterwards wrote in plaintiff's name as such grantee. When asked how he conveyed the consideration for the deed to the grantor, witness testified: "We paid that in the first place, sent it to him." But he does not know whether they sent the money to Idaho or Chicago. Later he was asked whether he sent any money out to Idaho when he sent the blank deed, to which he replied: "I do not think we did." He was then asked: "When did you pay for this deed then?" To this he replied: "I do not know, but it seems to me that we sent the money there to Chicago, and I believe that was it." Thereafter the following questions were propounded to the witness, and he gave the following answers: "Q. Did the letters you received from Kootenai give any particular address in Chicago? A. Why, it gave the name of some hotel there. Q. And you think that the deed from this man came to you by letter, do you? A. Yes. Q. And then you sent the money back down to him? A. That is what I think; but I am not sure about it." Later on witness testified that his partner, Bull, was down at or near Chicago at the time, and he believes that Bull got the deed himself, and paid the money direct to Young, and he says that they had previously received a letter from Young, stating that he would

make the deed at Chicago. Witness does not know whether the $25 was paid in cash or by check or draft, and he is unable to produce any of the correspondence claimed to have taken place in connection with the transaction, or to give any information relating thereto.

Witness Bull was sworn, and testified, in substance: That he had none of the correspondence or papers connected with the transaction, and does not know what has become of it. He is unable to state whether the name of any grantee was in the deed when he received it, nor whether any consideration was named in such deed. He first saw deed at Windsor Hotel, in the city of Chicago. When asked to state the circumstances, witness testified: "Why, I had come there to that hotel by appointment to meet Mr. Young. Q. How was that appointment made? A. I had a letter from Mr. Knauss while I was at Wheaton, Ill., visiting my wife's folks. Q. Do you know where that letter is now?" To this the witness replied that the same had been destroyed with other papers which were in his wife's grip, giving as a reason that a certain bottle of medicine which was in the grip became broken, and the papars therein contained became saturated with such medicine. He was then asked: "Q. But you had a letter from Mr. Knauss telling you to meet Mr. Young in Chicago at that hotel, did you? A. Yes, sir; at the Windsor Hotel in Chicago, to get a deed and pay him $25 for it, and I went to the hotel, and did not arrive there on time, owing to my inability to locate the hotel, and, when I finally got to it, I asked for Mr. Young, and the clerk asked me who I was, and I told him, and he said Mr. Young had waited for me a while, and then left, leaving some papers with him (the clerk) for me, and I examined the paper and saw that it was a deed properly executed and signed, and the clerk said he was to deliver it to me and I was to leave $25, so I took the deed and deposited the $25 there with the hotel clerk, and sent the deed to Mr. Knauss here in Bismarck. Q. You never saw Mr. Knauss personally with reference to this meeting, as you state? A. No, sir; I recollect that he sent the letter to me at Wheaton, Ill. Q. Do you know the name of the clerk of that hotel? A. No, sir; I had never seen him before and have never seen him since. I was not in the hotel; that is, I was not in the hotel over five minutes altogether. Q. The only thing you did was to leave the money with the clerk, was it? A. Yes, sir. Q. You do not know but what the clerk executed that deed, do you?

A. No, sir. Q. Do you know whether or not the man who executed this deed had any interest of any kind or description whatsoever in this land described in this deed? A. No, sir; I do not of my own knowledge. Q. You know it was the Windsor Hotel, do you? A. I am not really positive of that. I do not know the directions in Chicago very well."

The foregoing is the substance of the testimony of the persons who were instrumental in procuring the purported deed, and it impresses us very forcibly as being unworthy of credence. Hedrix, Knauss and Bull are all interested in the outcome of the litigation. According to the testimony, Hedrix is to receive $400 attorney's fees in the event plaintiff wins in establishing title. Whether Knauss and Bull are to share in this fee does not appear, but it does appear that they parted with but $25 according to their testimony to procure the alleged deed, and they received the sum of $100 from Bostrom therefor, and, if the deed is a forgery, they are legally bound to refund such sum. It is strange that these parties were so successful in locating Young while defendant was so unsuccessful, although he put forth every effort possible to do so, and even offered a reward for information leading to his whereabouts. Defendant was in possession of the premises, and had been for years, as Young's tenant, and was indebted to him for rent. He carried on a correspondence with Young until January, 1899, when it abruptly ceased since which time defendant has been unable to get any word from him. The fact that Young did not write or communicate with defendant during these many years is very convincing evidence that something happened to him to prevent it. It also impresses us as quite remarkable and unusual that so soon after Hedrix, Knauss, and Bull located Young, as they claim, they should have struck the bargain testified to by them whereby Young agreed to accept $25 for his interest in the land. Hedrix says that the letter received from Young was an unconditional acceptance of his offer to pay $25 for a deed. It is also rather a suspicious circumstance that Young did not immediately sign the deed in Idaho, which Hedrix claimed to have sent him, and return the same, instead of notifying Hedrix of his contemplated visit to Chicago, where he would close the deal by executing the deed. Why did he delay closing the deal until he reached Chicago? It is also rather out of the ordinary method of doing business for Young to execute the deed in the manner in which it is claimed he did without

giving his residence or address in the body of the instrument, without having his signature attested by witnesses, and it is also strange that he left the same with the hotel clerk to be delivered on receipt of the selling price. It is also a strange coincidence that Bull happened to be at or near Chicago at this particular date. It is, moreover, passing strange that every document—the alleged original deed and all correspondence relating to the transaction—by which the genuineness of the deed might be established, are lost or destroyed. Moreover, if the story told by Bull is true, the testimony of this hotel clerk would have been valuable evidence to corroborate his story, but no attempt was made to procure the testimony of this hotel clerk would have been valuable evicumstances, as well as others which we have not alluded to, all point with irresistible force to the conclusion that the story told by these witnesses is unworthy of credence, and the same has every earmark of fraud and perjury. Their story is most unreasonable and improbable, and we are morally convinced that Young's signature to the purported deed upon which the plaintiff's title is based is nothing less than a forgery, and we therefore have no hesitation in holding that the prima facie case made by plaintiff by the introduction of the certified copy of the purported deed is completely overthrown and disproved by the evidence in the record.

Entertaining these views, it follows that the judgment appealed from must be reversed, and the action dismissed; and it is so ordered.

Morgan, C. J., concurs.

Spalding, J. (dissenting). The conclusion reached by my associates in this case is sustained on the theory that three persons named in the opinion have committed perjury and one or more of them forgery, or have procured some other person to commit forgery. I am of the opinion that the evidence taken altogether does not warrant such a conclusion.

The complaint was in the statutory form for quieting title. The answer consisted of a general denial and an assertion of a superior title based upon a tax deed obtained by the defendant to the land in question while occupying it as a tenant of Frank E. Young, the original owner. When the case went to trial, the latter was the defense relied upon. Fraud was not pleaded. It is true there were several unusual facts and circumstances disclosed in the evidence,

such as loss of the deed and of the correspondence, but it must be borne in mind that negotiations were commenced with a firm which afterwards dissolved, and each member thought the other had the correspondence. The loss of some of the corespondence was reasonably and satisfactorily accounted for.

Considerable emphasis is laid upon the fact that the deed was not witnessed, and that the name of the grantee was not inserted, nor the residence of the grantor. My professional experience satisfies me that neither of these under the law and the custom of dealers in real estate in this state can be considered as necessarily a suspicious fact. The law of this state, unlike that of some states, requires no witnesses to the execution of deeds, and the practice of executing deeds and mortgages without witnesses is prevalent. The testimony does not disclose that the name of the grantee was omitted from the deed when executed. The witness testifying as to that testified that he did not know whether it was omitted or not, that he presumes it was, but disclaims knowledge. The defendant's own testimony shows that Young was a traveling man, and that he had corresponded with him on several occasions some years before this suit was instituted, and that he received one letter from him from Tacoma, another from Spokane, one from North Yakima, and one which did not disclose his whereabouts. He also testified that search was made for him in places where he had been known to be at times, and that he was unable to locate him, all of which goes to show that he may have had no fixed residence to insert in the deed.

The fact that the notary who took the acknowledgment was unable to recollect the fact of having done so, in view of her situation and the extent of her business, is not significant. She is a notary in the Sherman House in Chicago, and testified that she takes great numbers of acknowledgments. The transaction with her occurred 16½ months before her testimony was given, and, like other notaries, the most she could do was to testify that she had no recollection of the fact. She testified that from the time she became a notary she established the practice never to take an acknowledgment without either knowing the party personally or being introduced by some one that she did know, and stated positively that Frank E. Young was either introduced to her at the time the acknowledgment was taken by some person or persons with whom she was personally acquainted or that she personally knew him at

that time, but that she had no distinct recollection with regard to this deed. It is well established that where a certificate of acknowledgment is regular on its face the failure of the officer to recollect regarding the taking of the acknowledgment is not sufficient to overcome the recitals of the certificate. Wright v. Bundy, 11 Ind. 398; Tooker v. Sloan, 30 N. J. Eq. 394; Ford v. Osborne, 45 Ohio St. 1, 12 N. E. 526. The great weight of authority is to the effect that, where the grantor has appeared before the officer and an acknowledgment has been taken, the certificate of the officer in due form is conclusive of the facts certified, and cannot be impeached except for duress or fraud in which the grantee participated or of which he had notice before parting with his money. 1 American & English Encyclopedia of Law, 557, and cases cited. In those states which hold that it can be impeached it is held that the evidence to impeach the certificate must be clear and convincing beyond a reasonable doubt, and should do more than to produce a preponderance against its integrity, and should by its completeness and reliable character fully and clearly satisfy the court that the certificate is untrue and fraudulent, and that the presumption in favor of the regularity of the certificate is as strong as any that can be brought against it by the testimony of an interested witness, and that the burden of proof rests upon the party undertaking to impeach the certificate to show that it is false. 1 American & English Encyclopedia of Law, 560; 1 Cyc. 618.

The whereabouts of Young was ascertained by Knauss when Bull was absent, visiting his wife's relatives 25 miles from Chicago, and the evidence would indicate that when Mr. Young replied to an inquiry as to executing a deed, etc., for the land, he was on his way to Chicago, and therefore stated that he would execute the deed when he arrived there. The small price which he accepted, in view of the other facts, casts no suspicion whatever upon the transaction.

He had previously asked for $500 at one time, and $600 at another for the land, but, after offering it at those prices, a tax deed had been issued to it, and it is altogether probable and natural that he should deem anything he could get after the execution of the tax deed, no matter how small, so much clear gain. Again, if the circumstances of the situation are sufficient to justify the court in holding the title of plaintiff invalid, this can be done without reflection upon the integrity of any one except some one unknown, who may have personated Young in Chicago.

I do not deem the defendant's testimony worthy of full credit when viewed in the light of the fact that he was attempting to defraud his landlord by acquiring a tax title, adverse to his landlord's title, and the further fact that it was clearly shown that he made or caused to me made a change in the description of the land in the tax deed after its delivery to him, making it conform to the description of the land in controversy, which it did only partially when issued, and then caused a corresponding change to be made in the county records. While this case is in this court for trial de novo regardless of the findings of the trial court, yet, especially in this kind of a case, the findings of that court should be given due weight, and are entitled to much respect.

All the witnesses whose words are challenged testified personally before the judge of the district court, and he had a far better opportunity to judge from their demeanor, their appearance of candor, or lack of it, and other considerations, whether they were telling the truth or committing perjury than we have. In any action like this where title is attempted to be impeached purely by means of circumstances any of which may occur without fraud or an intent to defraud, the explanation given by witnesses can be best judged of by that court in whose presence they testify, and, when such court makes findings, they should be entitled to more than ordinary weight.

These reasons and others which I shall not discuss impel me to the conclusion that the judgment of the district court should not be reversed.