### AUGUST SHOCKMAN and Nicholas Shockman v. LAURA LOUISE RUTHRUFF and Charles D. Dickinson.

#### (149 N. W. 680.)

From an adverse judgment in an action to determine adverse claims and to have decreed as established two deeds in their alleged title, plaintiffs appeal, demanding trial *de novo*.

**Adverse claims — action to determine — lost deeds — existence of, established — title.**

1. Testimony reviewed, and *held* to establish the existence of the deeds in controversy. The judgment appealed from is ordered vacated, and a decree will be entered establishing such lost deeds, and quieting title in plaintiffs, and adjudging defendants to have no interest in the premises in suit.

**Appeal — motion to strike out matter therein — motion to vacate judgment — not part of statement of case.**

2. Respondents' preliminary motion to strike certain matter from the appeal record is granted. A motion to vacate a judgment and reopen the case for further testimony is not properly a part of the statement of the case, but is a matter occurring subsequent to the judgment appealed from.

**Appeal from judgment — subsequent order cannot be reviewed.**

3. An appeal taken from such judgment alone does not authorize a review of the order made after judgment denying a vacation of said judgment.

Opinion filed October 29, 1914. Rehearing denied December 3, 1914.

From a judgment of the District Court of LaMoure County, *Coffey,* J., plaintiffs appeal.

Reversed and judgment ordered.

*Davis & Warren* and *Pollock & Pollock,* for appellants.

The sufficiency of the evidence to establish the existence of the deeds in question, and also the fact that they are lost, cannot be gainsaid. Gibson v. Brown, 214 Ill. 330, 73 N. E. 578; Kenniff v. Caulfield, 140 Cal. 34, 73 Pac. 803; 25 Cyc. 1625, 1627.

If the court finds that the evidence as to the execution and delivery of the deed is not clear and satisfactory, then it certainly ought to remand and order the case reopened for further proof. 15 Am. & Eng. Enc. Law, 242; 23 Cyc. 889, 930; Duffy v. O'Donovan, 46 N. Y. 223; Sutherland, Code Pl. §§ 1696, 1717, 1718; Granger v. Roll, 6 S. D. 611, 62 N. W. 970; Gade v. Collins, 8 S. D. 322, 66 N. W. 466; Neeley v. Roberts, 17 S. D. 161, 95 N. W. 921; Gordon v. Kelley, 20 S. D. 70, 104 N. W. 605; 2 Cyc. 867.

*M. A. Hildreth,* for respondents.

On appeal from a judgment, no order made subsequent to judgment can be reviewed. Paulsen v. Modern Woodmen, 21 N. D. 244, 130 N. W. 231; Hedderich v. Hedderich, 18 N. D. 489, 123 N. W. 276; See Code Civ. Proc. § 7226.

On a motion for new trial on the ground of newly discovered evidence, diligence must be shown, competency of the new evidence must appear, it must also be shown that a different result can reasonably be expected or should be had. Code Civ. Proc. § 7063; Marshall v. Davies, 78 N. Y. 414; Bridger v. Exchange Bank, 126 Ga. 821, 8 L.R.A.(N.S.) 463, 115 Am. St. Rep. 118, 56 S. E. 97; Des Moines Sav. Bank v. Colfax Hotel Co. 88 Iowa, 4, 55 N. W. 68; Bissell v. Russell, 23 Hun, 659; Turner v. St. John, 8 N. D. 250, 78 N. W. 340; Second Nat. Bank v. First Nat. Bank, 8 N. D. 50, 76 N. W. 504; Goose River Bank v. Gilmore, 3 N. D. 188, 54 N. W. 1032.

The evidence fails to show that a warranty deed was ever executed by Laura Louise Ruthruff to Henry Ruthruff, and is lost. It must clearly appear that such deed was executed, acknowledged, and delivered; its conditions, must be shown, and the fact that it is lost must appear. Edwards v. Noyse, 65 N. Y. 127; Wakefield v. Day, 41 Minn. 344, 43 N. W. 71; Eiden v. Eiden, 41 Wis. 460; Metcalf v. Van Benthuysen, 3 N. Y. 430; McManus v. Commow, 10 N. D. 340, 87 N. W. 8; Garland v. Foster County State Bank, 11 N. D. 374, 92 N. W. 452.

In such cases, the greater the value of the instrument the stronger and higher should be the degree of proof required. Thomas v. Ribble, — Va. —, 24 S. E. 241; Clark v. Turner, 50 Neb. 290, 38 L.R.A. 441, 69 N. W. 843; Mays v. Moore, 13 Tex. 85; Chamberlaine's Best, Ev. pp. 213–215; Thayer, Ev. p. 729; 2 Moore, Facts & Weight of Evidence, p. 1037.

Where a person who seeks to establish rights under a lost or destroyed instrument by parol evidence as to the same, and as to its contents, his proof should be highly convincing,—especially where the rights are very valuable. Garrett v. Hanshue, 53 Ohio St. 482, 35 L.R.A. 321, 42 N. E. 256.

Goss, J. This suit is in equity to determine adverse claims. Preliminary to the merits, determination must be made of a motion by respondent to strike from the appeal record certain proceedings had upon a motion to reopen the case and vacate said judgment, the order of denial of which is not appealed from. The record facts on the motion to strike are that findings of fact, conclusion of law, and order for judgment made after a trial on the merits were filed, and a final decree thereon quieting title was entered December 7, 1911. One day before the entry of judgment, plaintiffs had served notice of a motion to reopen the case and to vacate any judgment that might be entered pending hearing, and that leave be granted to submit further testimony. This motion was denied February 5, 1912, to which ruling an exception was allowed, and notice of which ruling that day was served, together with a copy of the findings, order for judgment, and notice of judgment previously given, filed and entered. November 26, 1912, plaintiffs filed an undertaking on appeal, accompanied by a notice of appeal "from the judgment . . . herein entered on the 7th day of December, 1911." On January 31, 1913, hearing was had upon the settlement of a statement of the case, at which the trial court was asked to include, as a part of said statement, the motion and supporting affidavits, together with the order of denial thereon entered upon the previous application to vacate the judgment and reopen the case. The same were excluded from the statement of the case proper, to which exception was taken. The court, to facilitate a review of that order, made its certificate identifying the files used upon said motion as a part of the record

offered upon the application had for settlement of the statement of the case. Thereupon all of said proceedings, with the statement of the case as settled, appellants caused to be certified to this court as the record on appeal, contending that the same should have been settled as.a part of the statement of the case proper, and that the order denying plaintiffs' application to reopen the case for further proof is reviewable on this appeal from the judgment entered prior to hearing on said motion, vacation of which was denied. It is met by respondents' motion to strike said matter, as something occurring subsequent to the judgment appealed from, and not embraced within the appeal taken and, therefore not before this court for review, and as to which the order of denial is conclusive.

Such motion must be granted. The appeal is from the judgment only. The appeal taken does not constitute an appeal from the order of denial of a vacation of judgment and reopening of the case. Only those errors reflected in the statement of the case, and those appearing on the judgment roll, could be raised on this appeal. The motion to vacate and reopen for trial was something wholly subsequent to judgment. It was not a part of the trial had, but, instead, constituted a direct attack upon the judgment. Being subsequent to judgment, the order made thereon was an appealable order, and that, too, independent of the appeal taken on the merits from the judgment. Plaintiffs might have appealed from the order denying a vacation and leave to present further testimony, without taking an appeal in the main case. It is appealable as a matter covered by the 2d subdivision of § 7225, Rev. Codes 1905, permitting an appeal from "a final order affecting a substantial right made in special proceedings or upon a summary application in an action after judgment." Weber v. Tschetter, 1 S. D. 205, 46 N. W. 201, wherein it is held that this identical statute must be construed as "though its expression were a 'summary application in an action after judgment.'" Under § 7226, Rev. Codes 1905, "upon an appeal from a judgment the supreme court may review any intermediate order or determination of the court below, which involves the merits and necessarily·affects the judgment appearing upon the record transmitted or returned from the district court;" but this statute does not authorize this court to review on an appeal from the judgment only, an appealable order made subsequent to and wholly independent of the

judgment, and not concerning the proceedings had on trial, but constituting an attack upon the judgment. If the propriety of an order denying a new trial, entered after the judgment, cannot be reviewed on an appeal from the judgment only (and it is settled in Hedderich v. Hedderich, 18 N. D. 488, 123 N. W. 276, and Paulsen v. Modern Woodman, 21 N. D. 235, 130 N. W. 231, that it cannot be so reviewed in an appeal from the judgment only), "for the manifest reason that such order was made long after judgment, and the appeal is from judgment alone," then it follows this order for the same reasons cannot be here reviewed. See also Sucker State Drill Co. v. Brock, 18 N. D. 8, 118 N. W. 348, again on appeal 18 N. D. 598, 120 N. W. 757, and the same entitled case again in 18 N. D. 532, 123 N. W. 667. Had the application to reopen and for further testimony been made and decided in advance of the findings, it would have constituted part of the proceedings had on the trial, and been an intermediate order made during trial, and as such its incorporation within and as a part of the statement of the case would have been proper, and the propriety of a ruling thereon would have been reviewable upon an appeal from the judgment, which would invoke a review of all the proceedings contained in the statement of the case. Under the Sucker State Drill Co. v. Brock Cases, one appeal could have been taken covering both judgment and the subsequent order complained of, but this was not done. Kinney v. Brotherhood of American Yeoman, 15 N. D. 21, 106 N. W. 44, is also directly in point on that question of practice. The court properly excluded such extraneous matter in settling the statement of the case. It likewise followed proper practice in identifying the excluded matter by certificate as offered for settlement, thereby authenticating the record for appeal on the question submitted on this motion.

The merits are now reached for a trial *de novo* upon the testimony upon which the judgment was entered. Both parties plead title in themselves. Plaintiffs assert that defendant Laura Louise Ruthruff, by mortgage foreclosure sale of a $60-mortgage held by her, procured a certificate to be issued to her thereon January 24, 1898, and which was recorded three days later. Plaintiffs assert that such sale was completed by the issuance thereon of a sheriff's deed June 27, 1899, to said certificate holder. That she and her husband soon thereafter conveyed said land to Henry Ruthruff by written deed of warranty delivered to him.

In April, 1902, Henry Ruthruff and wife conveyed by deed to the Iowa Land & Trust Company, a corporation, which in March, 1905, deeded to August and Nicholas Shockman. Such alleged sheriff's deed and alleged warranty deed from defendant to her father-in-law, Henry Ruthruff, were not recorded, and are alleged to have been lost or destroyed. W. Edd. Ruthruff, husband of Laura Louise Ruthruff, and son of Henry Ruthruff, died June 28, 1902, an inmate of the state insane asylum. The alleged sale by Henry Ruthruff to the land company was conducted wholly by mail, and closed at a time when Ruthruff was sick, necessitating the assistance of a neighbor, F. D. Hall, and his examination of title papers to the land, and his making a memorandum of what was so sent with the deed to the company; and which memorandum, attested by Hall, was delivered to old man Ruthruff, and by him retained, is in evidence together with testimony explanatory thereof. The defendant Laura Louise Ruthruff concededly is the owner of the property if she did not, prior to April, 1902, deed the land to her father-in-law, as claimed by him. She has never seen the land, nor been in possession thereof, nor claimed rents or profits therefrom. In August, 1909, Shockman discovered that the supposed sheriff's deed on foreclosure, and the alleged deed of Laura to Henry Ruthruff, were both unrecorded, causing a break in their record chain of title. She was thereupon asked soon afterwards to quitclaim this land to Henry Ruthruff, who in turn was to quitclaim it to plaintiffs. This she finally refused to do. She subsequently made an affidavit before one Ernest Malmberg, dated August 31, 1909, reciting that "the said certificate of sale is lost, and cannot be found by this affiant; that this affiant has never sold, assigned, or transferred said certificate of sale, or in any way disposed of her interest in said land;" and thereon procured from the sheriff of La Moure county a sheriff's deed to her as grantee, dated December 23, 1909, upon the old foreclosure, upon which a sheriff's certificate of record had been issued January 24, 1898, or eleven years before. Upon this sheriff's deed she asserts title. It appears that on October 13, 1897, a receipt for $15.61 taxes for the year 1893 was issued in her name. Otherwise she had paid no taxes on said premises before recording her sheriff's deed August 31, 1911, about two months before the trial of this case. This action was begun by summons dated March 24, 1910.

These are the main facts reflecting the claims of the litigants. The issue is one of fact. Has Laura Louise Ruthruff ever deeded this land to her father-in-law, Henry Ruthruff? If so, plaintiffs own the land; if not, she owns it.

The circumstances determinative of the merits occurred from twelve to fifteen years ago. Time must dim the recollection, a fact important in weighing the testimony. Possession of the premises for ten years before the trial had been in the plaintiffs or their grantors. During such period defendant had never made even a claim of either possession or of ownership. During those years she has done no act to assert title and possession. Instead, she suffered what right she had to remain dormant while possession was enjoyed and title was claimed by others. The evidence is as convincing as it is overwhelming that she was ignorant of the fact that records of LaMoure county disclosed her to be the record owner of this property until after the plaintiffs themselves had discovered the absence of record of deeds in their chain of title, and had not only requested her for a quitclaim deed to bridge such deficiency in record title, but had informed her fully of why her deed was necessary. She had had much experience as a stenographer in law offices, is a woman of mature age, thirty-nine years, and from the record it appears from her own testimony that since she has possessed knowledge of her possible interest in this land she has ever been alert to safeguard her interests therein. Her recollection, especially of events transpiring during the year before the trial, as to visits made her to induce her to deed the land, ought to be clear, as that of one in the prime of life. But she has testified as one fully conversant with the issues in her case. Her father-in-law, Henry Ruthruff, was almost eighty-five years of age at the time of trial, and, needless to say, his testimony should be taken as more or less unreliable because of his extreme age, aside from his admitted interest in the outcome of his case as a grantor by warranty deed. The testimony given by Shockman must also be regarded as that of a party in interest. We must look elsewhere for corroborative circumstances in weighing the testimony of these parties and in determining facts.

The next important circumstance supporting the plaintiffs' contentions and antagonistic to the whole theory of defendants' case is that the evidence convincingly and conclusively establishes that on June 27,

1899, or ten years before defendant discovered that the records disclosed she had any interest in this land, a sheriff's deed thereof upon foreclosure had been in fact issued and delivered to her husband, presenting said certificate of sale. This is established by Ex-sheriff Stewart's testimony, supplemented by his sheriff's daybook in evidence, from which it appears that W. Edd. Ruthruff on June 26, 1899, produced said certificate, and received in lieu thereof a sheriff's deed to Laura Louise Ruthruff. The entries in the daybook are made under the caption of "Laura Louise Ruthruff, plaintiff, v. Henry Ruthruff and Armanda Ruthruff, defendant," followed by the memorandum record of "received from W. Edd. Ruthruff, June 26, 1899. When received: June 26, 1899,"—written under the words, "month," "day," and "year" respectively. And under the heading, "date of service," under the words, month, day, and year respectively, appears, "June 27, 1899 ;" and under the heading, "when returned," month, day, and year respectively, appears the date "June 27, 1899 ;" following which are the words, under the heading, "sheriff's fees, amt., costs," "issuing deed, $2.00," respectively, under "fees and costs ;" after the words, "kind of process" are the words, "sheriff's deed ;" after the words, "by whom served" are the words, "D. F. Stewart." On this important transaction the testimony of Stewart is explicit and positive to the fact that he was at the time sheriff of La-Moure county, was well acquainted with W. Edd. Ruthruff, who at one time had been a resident of that county, and that he recalled the transaction had with him, in which he as sheriff had received a letter from him inclosing a certificate of sale, with a letter of instructions to issue a sheriff's deed to Laura Louise Ruthruff, which he as sheriff had issued. Supporting his testimony he produces said "Sheriff's Daybook," his private record book, furnished him by the county, and testifies to the foregoing entries made therein by him as being in his own handwriting; that he canceled the certificate by writing across the same in red ink, "Deed issued on the within certificate," and signed the cancelation as sheriff of the county, and issued the deed, and returned it to W. Edd. Ruthruff, who paid him his regular fee therefor. That the reason the entries in the daybook were entitled as in an action was because Henry Ruthruff and wife were the mortgagors. Witness Stewart also produced "the Sheriff's Daybook of LaMoure County," an official county record

book, a page of which is in evidence as "exhibit H," and which is in the handwriting of Stewart, and made as his official record of his acts performed while in office. It contains all that is recited as entered upon his private record, naming the parties, designating the instrument as sheriff's deed, as received, served, and returned by himself on the same dates as given in the other memorandum, and containing the added entries, "sheriff's fees, earned $2.00, sheriff paid $2.00, plaintiff's attorney, W. Edd. Ruthruff;" remarks: "deed issued to Laura Louise Ruthruff, covering ¼ of 6–134–62." The land involved is the southeast quarter of section 6, township 134 range 62. This, together with the positive testimony of Henry Ruthruff and Frank D. Hall, together with the abstract in evidence as "exhibit C," purporting to be dated April 1, 1902, as a "memorandum of papers sent to R. A. McMichaels, LaMoure, N. D., April 1, 1902," accurately describing this land, the third entry of which is "sheriff's deed to same property," immediately following the description, and bearing all the car-marks of authenticity, —places the fact of the existence of an outstanding sheriff's deed on foreclosure to this property beyond all reasonable doubt. In addition to this, Ryan, who negotiated the purchase of Henry Ruthruff for the land company, and who examined the abstract of title and title papers he says accompanied them, testifies by deposition in advance of trial as follows:

I saw the sheriff's deed.

Q. What sheriff's deed?

A. The sheriff's deed to Laura Louise Ruthruff from the sheriff of LaMoure county.

Q. Covering what land?

A. Covering the southeast quarter of section 6, township 134, range 62.

Q. What other papers, if any, did you see and examine at that time?

A. A warranty deed from Laura Louise Ruthruff to Henry Ruthruff.

Q. On the same land?

A. Same land.

Q. Any other papers in connection with this deal?

A. It seems to me that there was a release of mortgage, but I am not positive.

Q. Did you examine the sheriff's deed to Laura Louise Ruthruff, and warranty deed from her to Henry Ruthruff, so as to know they had been filed for record?

A. I did.

Q. What is a fact as to them?

A. They had not been recorded.

Witness then testifies to having directed McMichaels for the land company to have them recorded, and that "he said he would have them recorded;" and Ryan testifies to circumstances showing the likelihood of the deeds having been burned in a fire in another state, destroying some of his records.

The fact of the sheriff's deed outstanding, though unrecorded, is especially important when the haste of the defendant in perfecting record title in herself upon the discovery of her opportunity to lay claim to this land is considered. Plaintiff August Shockman testifies to discovering the missing links in the record title between the 8th and 15th of April, 1908, resulting from an attempt to obtain a loan on the property, he being then informed that the title was bad, by Attorney Blackwell of LaMoure, since deceased. Sometime thereafter he went to Fargo, and saw Henry Ruthruff about it, and found out he did not have title papers in his possession, and was informed by Henry that he had once possessed a deed from the defendant. Shockman then went to see her about it, informed her of what he supposed to be the facts: "asked her first if she ever owned any land up in LaMoure county, and she said she did one time, and she said this land was sold by her to Henry Ruthruff, and all the papers in connection with this deal were turned over to him at the time the deal was made in 1899." "She was perfectly willing to deed (to give quitclaim deed), as she had no interest in the land. She said there might be some of the papers at Tilley's office, with Malmberg, to go down and see him about it." Shockman then testifies to going to Malmberg's office the following morning, and conversing with him about the matter, and "I did about the same as I had with Mrs. Ruthruff. I told him I was looking for the two deeds to Ruthruff. He made a search in the office for his papers, and could not find them. . . . "I told him the condition the title was in as near as I could." "Q. State what he said?" A. He said there would

be a good chance for her to come and claim the land." He found no papers in connection with the title, and witness went home to LaMoure. Independent of the details of the conversation, the defendant denying in the main the statement of the plaintiff, her denials are more or less qualified and indefinite as to such very recent occurrence. The fact of Shockman's first visit to her and statement of the object of his visit, and his request that she give him a quitclaim deed, stands virtually undisputed. Her testimony on that circumstance is: "Q. Did Mr. Shockman come to see you? A. Yes sir. Q. About when as near as you can recall? A. As near as I can recall, about the same time or previous, I could not say." The time in the answer has reference to the visits of Henry Ruthruff and Attorney Twitchell for the same purpose, of having her execute and deliver her quitclaim deed to Henry to cure the record title and to take the place of the alleged lost deeds. Reference to the dates filled in quitclaim deed blanks taken by said witnesses for such purposes at the time of the visits discloses the date, both in the body and acknowledgment, to be September, 1909, as appears from "exhibit B," in evidence. With the blank quitclaim deed there was also prepared for her signature and verification a form of affidavit reciting the loss of the sheriff's certificate of foreclosure sale, and that no sheriff's deed thereon had been issued, and a request for the issuance of a sheriff's deed on the old foreclosure. This blank form of affidavit is in evidence as "exhibit A," with the date typewritten in the instrument, of September, 1909. There is also in evidence an original affidavit admittedly signed by Laura Louise Ruthruff upon the note-head of J. W. Tilley, lawyer, purporting to have been subscribed and sworn to August 31, 1909, before Malmberg as notary, with his notarial seal affixed, the seal plainly bearing the imprint of his name. The deed is material in that it purports to antedate the visits of Twitchell and Henry Ruthruff, and, their visits being after that of August Shockman, who first informed the defendant of these missing papers, establishes that, very soon after learning of the state of affairs, she was preparing to assert title to the premises, something that she had not done for the dozen years immediately preceding and after foreclosure sale. The only reasonable inference to be drawn from such delay under the circumstances is that of ignorance on her part of her interest, if any she had, in this land. And her said affidavit is corroborative of Shockman's testimony, indicating

that Malmberg was also alive to the situation and to the possibility of an advantage to be secured by her under a claim of title, just as Shockman says he was when he testifies, Malmberg "said there would be a good chance for her to come in and claim the land." This purported affidavit recited that a sheriff's certificate of sale was issued to her January 24, 1898, on foreclosure; that the period of redemption is long past, and the certificate is lost and cannot be found; that she has not disposed of her interest in the land, nor assigned the certificate of sale; and that it is made "for the purpose of securing a deed to the above-described premises from the person making the sale, or his successor in office." If this certificate was sworn to August 31, 1909, as it purports to have been, it was very soon after she had learned of the possibility of laying claim of title to this land. Notwithstanding the purported date of the affidavit, there is in evidence ("exhibit 1") Dickinson's letter, dated December 18, 1909, to the sheriff of LaMoure county, applying for issuance of sheriff's deed. The sheriff testifies to receiving this letter about December 18, 1909, and to having complied therewith by issuing sheriff's deed December 23, 1909, to Laura Louise Ruthruff, mailing the same to Dickinson. Defendant bases her claim of title upon this deed. It is noticeable that, taking the affidavit at its face, nearly four months elapsed after its execution before its presentation for deed, or else the affidavit is dated back to show a date earlier than its true date. It would seem also, from the testimony of the defendant, that at least a loss of memory exists of Malmberg's connection with the matter, and also an endeavor to give prominence to that of Dickinson, while at the same time defendant admits that the latter never obtained any interest in the land. She was called for cross-examination, under the statute, as the first witness in plaintiffs'·case, and while we know from experience that some witnesses under such circumstances manifest, aside from undue reluctance to testify, the disposition to be evasive in spite of the merit of their case afterwards developing, yet her testimony in this instance is unusually so as to all matters of vital importance subsequently testified to by Henry Ruthruff and August Shockman. She evinces an anticipation on her part of what they would testify to, which in itself presupposes her knowledge of something under her testimony not occurring or contrary thereto; and her answers as then given

are, strange to say, as indefinite as those given by her to substantially the same questions, near the close of the trial, are definite and to the point. As illustrating, as part of her cross-examination under the statute, these questions and answers appear:

Q. Did he (Shockman) come to see you to ascertain if you had some papers affecting the title to this land?

A. In fact he got but very little response from me, as I did not know the man.

Q. Did you in response to that question tell him you had no such papers?

A. I told him I knew nothing about it. I did not think it was necessary to talk my business over with him.

Q. Did you tell him in substance or in words to the effect that all the papers affecting the title to the land described, being the land involved in this suit, had been turned over to your father-in-law, Henry Ruthruff?

A. No sir.

Q. Did you not talk freely, and tell him all the papers were turned over to your father-in-law, Henry Ruthruff?

A. *I don't think so.*

Q. Will you swear that you did not?

A. *No, sir.*

And later in the same examination the following appears:

You recollect the visit of Shockman you were talking about?

A. Yes, sir.

Q. After that Henry Ruthruff requested you to make a quitclaim deed, and did not you say, I haven't any of the papers, and for him to ask Malmberg?

A. *I cant' swear to that.*

Q. Isn't it a fact that Malmberg advised or suggested to you to tell Ruthruff that you did not wish to sign the affidavit and quitclaim deed?

A. *I certainly did not have anything to do with this Mr. Malmberg.*

Q. Did you not instruct him to tell Ruthruff that you would not sign the papers?

A. *I couldn't swear to that.*

28 N. D.—39.

Q. Did not you say to Henry Ruthruff that you would look into the matter, and that he (Malmberg) was looking after this matter?

A. *Not that I recall,* Dickinson was looking after my business.

Q. Did not you send Henry Ruthruff, after leaving the papers with you, to see Malmberg as to whether or not you would sign those papers, namely the affidavit and quitclaim deed?

A. *I don't think so.*

Q. Did not you keep that paper (the affidavit blank) after Ruthruff brought it to you, and give it to Malmberg?

A. *I don't remember.*

Q. Did you tell Malmberg to tell Ruthruff that you would not sign it?

A. *I have no recollection of it.*

Q. Will you say that Henry Ruthruff did not bring that paper and affidavit "exhibit A" to you?

A. *I have no recollection of it.*

This well illustrates the character of her testimony on her first examination. Contrasted therewith is the following toward the close of the case, given with the understanding of the issues and after hearing the testimony of her father-in-law, Shockman, and others:

Tell the court what was said and what you said to him (Shockman).

A. He came to my house, and introduced himself, and told me his name was Shockman. He said he was trying to clear up the title to some land he was going to sell. I understood he was going to sell it. Something was wrong with the title. I told him it was not my land and I never sold it. I did not know what he was talking about. He said Henry Ruthruff had done the business and had handled it. I gave him the old gentleman's address, and *gave him Malmberg's address.* I told him my papers were in Tilley's office, and *that he could go there and find some information, and I did not know anything of it.*

Q. Did you at any time in that conversation say in effect that you did not own that land in LaMoure county, and did not claim to own any land there?

A. No sir.

Q. When did you first discover that the sheriff's certificate was missing or taken from the files and papers?

A. *When I got the papers* after Tilley's death, *in the fall of 1908.*

Q. I will ask you if you are very positive and clear in your mind as to whether or not you have at any time or under any circumstances executed a deed to this land to your father-in-law, Henry Ruthruff?

A. *I never did.*

Q. Did you, during the conversation with Shockman, state in substance, or anything like it, that you had transferred this land to your father-in-law?

A. No sir.

Q. Was there any conversation like that?

A. No sir.

Q. Did you ever authorize your husband to make a deed to your father-in-law?

A. No sir, *I told Shockman I did not know but the land was sold.*

Her testimony is in flat contradiction to that of Shockman and her father-in-law. On the whole, the probabilities under the admitted facts as strongly corroborate the plaintiffs' theory of the case, as under the circumstances it tends to condemn the defense. Her case rests solely on her testimony, without a supporting circumstance.

But it is strenuously contended that there is no substantial testimony that defendant ever deeded this property to her father-in-law. The testimony of Henry Ruthruff is naturally more or less indefinite as to time and the occasion and circumstances of such transfer of title, but no more so than would be expected where a man of his age testifies to occurrences a dozen years in the past. Had it been explicit in such particulars, undoubtedly it would have been open to question as being too definite to be credible. But the testimony of the witness Hall impresses with its straightforwardness and apparent truthfulness. Besides, it has a written basis in fact in "exhibit C," heretofore referred to, and which from its importance is fully set forth. It reads:

A memorandum of papers sent to R. A. McMichaels, LaMoure, N. D., April 1, 1902.

1. Warranty deed from Laura Louise Ruthruff to Henry Ruthruff.

2. Abstract of title to S.E. ¼ of 6–134–62.

3. Sheriff's deed to same property.

4. Statement of taxes on same property dated 2–27–1900, from the treasurer of LaMoure county.

5. Statement of taxes on same property from LaMoure county auditor, dated 12–28–1900.

6. Treasurer's redemption receipt, No. 1349, on same property dated 12–28–1900.

7. Letter from C. J. Allister, LaMoure county auditor, to W. E. Ruthruff, dated 12–17–1900.

8. Letter from State Bank of Edgely to W. E. Ruthruff, dated 12–18–1900.

9. Mortgage note for $400 from Henry Ruthruff to Fargo Loan Agency to Omar W. Folson, Docket C, page 325.

10. Mortgage deed for $400 from Henry Ruthruff and wife to Fargo Loan Agency, Docket C, page 325.

11. Assignment of mortgage note No. 11,944, from Fargo Loan Agency to Omar W. Folson to Henry Ruthruff.

12. Satisfaction of mortgage from O. W. Folson to Henry Ruthruff.
   Attest:
               F. D. Hall,
               4–1–1902.

Hall testifies to having written this memorandum, in reality and effect an abstract of title of certain very important instruments. He says:

I was requested by either Ruthruff or his wife to mail the number of papers which are listed to R. A. McMichael, of LaMoure. Ruthruff had been quite sick for some time. At that time he was feeling some better, but I talked the matter of the papers over with him, and made this list; as I observed the papers being considerably of value, I made it partially for my own protection, and partly for his so I would know exactly what I had mailed.

Q. State from what you made up the list?

A. Made it from the papers themselves.

Q. How did you make it from the papers themselves?

A. I got the title from the papers after examining the papers to see what the title indicated.

Q. I will ask you to what extent you examined the papers?

A. Merely to see if what was indorsed as a warranty deed was a warranty deed, so with all the other papers, to see if they were what they were purported to be.

Q. State if they were what they purported to be from what examination you made?

A. *There was a warranty deed from Laura Louise Ruthruff to Henry Ruthruff*; there was an abstract of title to the land involved in this action; there was a sheriff's deed to the same property.

Q. State what you did with the list, "Exhibit C" after you made it?

A. Gave it to Henry Ruthruff.

Q. When did you last see it?

A. I think you showed it to me last August. . . . May have seen it in the hands of Mr. Ruthruff once between that time. Don't remember exactly, rather seems as though I did.

Either this exhibit is fabricated evidence offered on wholly perjured testimony as a basis, or it is exactly what it purports to be, an abstract executed contemporaneously with the first sale after defendant had deeded the land. Our conclusion is that this exhibit is genuine, and, taken with his testimony, carries conviction. It strongly tends to establish as an ultimate fact that an instrument, in form a warranty deed of Laura Louise Ruthruff and of this land, was outstanding and *in the possession of Henry Ruthruff*, April 2, 1902, thereby raising the presumption of its having been previously delivered to him. Nothing in the cross-examination of this witness or in the circumstances surrounding the making of this exhibit and the cause for its existence casts any doubt as to its authenticity or his truthfulness. This testimony, with that of the circumstances of the subsequent transfer for value and use of these title papers by the purchaser in the consummation of the sale then in progress by Henry Ruthruff to the land company, makes it a reasonable as well as natural and unavoidable conclusion that the purchasing land company did the usual thing of relying upon an abstract of record title down to the break in the chain of title, showing the fore-

closure certificate issued to defendant, which, supplemented with the two title deeds unrecorded but delivered to them by Henry, completed the title. The abstract, together with sheriff's deed and the warranty deed, both mentioned in "exhibit C," would place full knowledge of the condition of the title before the purchaser. And this is exactly what Ryan testifies was the situation and the documents acted upon in the purchase. He was then the manager of this company, engaged in buying and selling land, and testifies he received the deed of Henry Ruthruff and defendant's deed to Ruthruff and sheriff's deed to her, all unrecorded, together with the abstract of record title, and approved the title tendered, and *directed the recording of the unrecorded instruments.* To this he testifies positively and unreservedly, and that he caused the abstract to be delivered to the Shockmans after the company had sold them the land. That there never was any question as to the title of this land being in his company or its grantees until recently. Ryan testified by deposition, was cross-examined at length, during the course of which he testifies: "I am absolutely sure that I had that conversation" (with McMichael about recording these documents and the title under them), "and about these papers" (referring to these deeds). There is also in evidence another record corroborating circumstance that Henry Ruthruff had an interest in this land the next year after the issuance of the sheriff's deed to Laura in 1899. It is one of the tax records of LaMoure county containing the following recitations: "Tax sale record, December 7, 1897, delinquent tax of 1896, of southeast $\frac{1}{4}$ of section 6, township 134, range 64, E. R. Davidson, sold to State Bank of Edgely for $16.61, *redeemed by Henry Ruthruff, December, 28, 1900,* for $29.40." The same record book for 1894 for the tax of 1893 on this land shows it to have been "redeemed at 7 per cent by Laura Ruthruff *August 13, 1897,* amount, $15.61." The foreclosure record as disclosed by the abstract of title in evidence shows that this redemption by defendant was preparatory to her foreclosure proceedings by advertisement following soon thereafter, the first publication of which was December 17, 1897, with sale had January 24, 1898. Again, these circumstances coincide with and tend to prove the possession of an interest in the land by Henry Ruthruff arising between these two dates. Another circumstance appearing from the record is also significant; $800 of the $1,200 consideration for the sale by Henry Ruthruff to the company was paid

by a mortgage back given by the company to Henry Ruthruff for said amount, maturing, $400 in three years, and $400 in five years after the sale in April, 1902. Either Henry was selling land, title to which he believed he possessed, or he was giving his warranty deed when he must have known he had no title. That he sold on long time is strong evidence of his belief in ownership back in 1902, as it is grossly improbable that had he known that he had no title, and that he was therefore perpetrating a fraud by the sale, he would have given the purchaser such a sufficient length of time to discover it before he, Henry, could realize the proceeds of such fraud. The record discloses he did not assign this mortgage of record, but that the same was paid when due, April 5, 1907. Other incidents showing care in this purchase are that before closing the deal with Henry the company required satisfaction of a prior existing mortgage on this land, which satisfaction was filed of record April 7, 1902, and on May 21, following, the company also redeemed from outstanding taxes. The presumption is rather that the title to this land was carefully passed upon, examined, and approved, than the contrary, before said purchase. And it seems very improbable that the absence of two such documents as a sheriff's deed consummating a foreclosure title, and the next deed in the direct chain of title, would be overlooked.

McMichael, who assisted in the negotiations and sale of Henry to the land company, has testified, and counsel for the defendant has made much of the fact that he has no positive recollection of the record title or of the exact deal. He recollects that the company had a transaction with reference to this land in the spring of 1902, with Henry Ruthruff, conducted entirely by correspondence. He does not remember whether it was a cash deal, or whether a mortgage was taken back in part payment, nor the amount of the sale, but he does recollect Ryan having made a deposit on the purchase; "Ryan examined the title in closing the deal." That Ryan was somewhat personally interested in this purchase, and because of that "suggested that he was concerned and that he ought to examine the record. I thought that ended it." That he has made search for files, papers, and correspondence, and has been unable to find any after a thorough search. Witness was sixty-one years old at the time of trial, and testifying to matters occurring approximately ten years previously. His testimony in some respects is corroborative of the contention of the plaintiffs. That he does not recollect the state of

the title at the time of purchase is a circumstance entitled to no great weight as against all the evidence supporting plaintiffs' position.

A careful review of all the evidence convinces that beyond any substantial doubt this defendant, between June 27, 1899, and December 28, 1900, and probably soon after the date of the sheriff's deed, June 27, 1899, did deliver her warranty deed of this land to Henry Ruthruff. That there were dealings between her husband and his father, Henry, and that an indebtedness existed of over $2,000, of son to the father, is established by the written declaration of trust dated February 19, 1902, in evidence. A consideration easily could have passed, as Henry says it did, for this transfer. The death of W. Edd. Ruthruff, June 28, 1902, in the Jamestown asylum, where he received treatment for six weeks immediately prior to his death, raises no presumption that he was insane on or before December 28, 1900, prior to which date the tax redemption record shows the father had an interest in this land. Besides, defendant must have deeded, and if her husband had been mentally deficient she would in all probability have been more cautious in what she signed at his request. She does not defend on the ground of having been induced to deed by fraud or mistake, but she claims never to have deeded at all. No importance can be placed on the circumstance of her husband's insanity. It is mentioned, however, that nothing may be taken as overlooked. While she challenges the consideration for her alleged deed, it may be remarked that it is doubtful if any sufficient consideration existed for her own claim of title. True, she testifies to the general statement that her husband gave her this land, but the fact, nevertheless, she was ignorant of her ownership of it for seven years after his death, during which time others had undisputed possession under a belief and claim of title, amply justified under the evidence, does not evince much of a pecuniary investment in fact, or it would have been thought of and looked after, instead of remaining unknown and abandoned. We are constrained to find that she has no title and is defending without merit. This and other courts have held that, before title can be found in this plaintiff, this lost link in the chain "must be established by clear and satisfactory evidence." McManus v. Commow, 10 N. D. 340, 87 N. W. 8; Garland v. Foster County State Bank, 11 N. D. 374, 92 N. W. 452, and Young v. Engdahl, 18 N. D. 166, 119 N. W. 169. But these holdings are likewise authority to the fact that,

where the transfer is so established, the court should not hesitate to find such to be the fact. And the lost deed when established is, of course, as sufficient to transfer title as though the deed whose once existence is decreed never had been lost. 25 Cyc. 1614. Counsel for the respondent here contends, as he did below, that to establish this deed plaintiff must prove that defendant signed said deed, if it is shown one existed, and duly acknowledged and delivered the same, or caused its delivery, to her father-in-law. Upon this point the trial court, from remarks in the record, evidently considered the proof insufficient and unsatisfactory. It is not as conclusive as the showing that such a deed existed, or as that establishing the original sheriff's deed issued. But the proof that defendant both signed and acknowledged this deed is as certain as could reasonably be expected when the circumstances are considered. No more than a reasonable degree of certainty is required under these conditions. "All that parties in such cases can be expected to remember is that they made a deed, to whom, and about what time, for what consideration, whether warranty or quitclaim, and for what property. To require more would in most instances practically amount to an exclusion of oral evidence in the case of a lost or destroyed deed." Perry v. Burton, 111 Ill. 138, 140; Chamberlayne, Ev. § 1009. And it may be established by circumstantial evidence. 8 Enc. Ev. 348. "The execution of a lost instrument may be sufficiently established, as against him, by the subsequent acts and admissions of the party charged to have executed it." 8 Enc. Ev. 362. That the defendant has had no knowledge of an interest as now claimed, for these many years, during which time she has been out of possession, raises a presumption that she had parted with it, and is likewise evidence that she had signed this deed and acknowledged it as well, the acknowledgment being a material part of the act of transfer. August Shockman and Henry Ruthruff both testify of her recent statements that she had transferred this land and delivered all papers to Henry in 1899, and this is strong evidence against her on these points. Her own testimony taken altogether, indefinite at first, but positive at the conclusion when elicited under almost if not quite leading questions of her own counsel, discredit her denials, and with it her claim of title.

Henry testifies as follows: "Laura Louise Ruthruff, she signed a

warranty deed. . . . She signed the papers, everything necessary, the deed." On cross-examination he states:

Q. The deal was made with your son?

A. Yes sir, the deal was made with my son.

Q. Will you swear she was present any of the time?

A. She was in once. She told me if it was in her name, she was willing to sign the deed.

Q. Did you ever take more than one deed of any kind, leaving out the sheriff's deed?

A. But one.

Q. Do you know who took the acknowledgment when you got this deed from Laura?

A. No, I can't think.

Q. Do you know who witnessed it?

A. No.

Q. What did you do with it when you got it?

A. Kept it in my box with my private papers.

Q. Where was Laura Louise when she signed this deed?

A. I could not just say if it was at Lawyer Tilley's office or at the house.

Q. Will you swear you saw her sign the deed?

A. Her name signed to it, of course.

Q. Will you swear that you saw her sign her name to the deed?

A. Well I don't know. I think it was done when I was right present.

Q. Will you swear you saw her sign her name to the deed?

A. I know she signed it, yes.

Q. Will you swear you saw her sign her name to the deed?

The Court: Can you answer that question?

A. I will not be positive about that.

Q. And you took it home and put it in the tin box?

A. Yes sir. I know where I actually took it.

Q. You took the deed home and put it in the tin box?

A. Yes, took it and put it with all the papers.

Q. You can't tell who drew the deed, can you?

A. I think Tilley did.

Q. You think, that is all, you don't know so?

A. I think it was in his office.

Q. Will you swear that he drew that deed?

A. No.

Q. You can't tell before whom it was acknowledged?

A. No.

Q. You can't tell who the witnesses were?

A. No.

Q. All you know about that deed business is that your son brought you a deed purporting to be signed by Laura?

A. No, not purporting, signed right in the office.

Q. You say it was signed in an office?

A. No, I can't say signed, it was handed to me right in the office?

Q. Did she sign it?

A. Yes, sir.

Q. You did not see her sign it, did you?

A. No, I would not say.


Much more similar testimony by Ruthruff is in the record.

Witness Hall testifies he examined this deed when making "exhibit C;" that "this document purported to be a warranty deed to the property involved in this action, and it was in the ordinary form and signed by the name Laura Louise Ruthruff. I don't remember if the middle name was in it or not. It was signed by the name of Mrs. Ruthruff, I don't know if it was both names or not." Cannot now state whether the instrument was acknowledged or not. On cross-examination, he testifies:

Q. You don't mean to testify there was a warranty signed and acknowledged by Laura Louise Ruthruff, signed and acknowledged by her here by your own personal knowledge?

A. A deed that purported to be signed by her.

Q. And that is as strong as you want to put it?

A. Yes sir.

Q. How much time did you spend altogether in looking over these papers?

A. Perhaps an hour or an hour and a half.

Twitchell testified that he, either later in the fall of 1909, or February 1910, had visited defendant with Henry Ruthruff, "I told her I came up to see her with reference to the LaMoure county land, and ex-

plained to her what I understood the conditions was, that there had been an instrument, or sheriff's deed, or warranty deed, that had been lost, and that I thought in fairness to her father-in-law she ought to give a quitclaim deed. She said at first there had been one. She said at first that the land had been deeded by her, and I asked her who it was to, and she said to a man named Dickinson. . . . I asked her if she had deeded the land, and she said she had; and I went on to explain the result of her doing that, and explained that it might be that the old gentleman would be up against a suit on his warranty deed, and I said, 'Mrs. Ruthruff, you don't want your father-in-law to be in trouble;' and she said these people got title to the whole land when the deed was prepared to protect her father-in-law,—rather protect Malmberg." She also stated that she had not received her money on the deed which she had given to Dickinson; that her husband had given her to understand that this was her land; that she refused to quitclaim; that the reference to protecting Malmberg, witness concluded, was because he had stated during the conversation that Malmberg and Dickinson would "have to make good on the warranty." Witness showed her "exhibit C," and that it showed from the list that she had deeded the land and turned over the sheriff's deed to her father-in-law, and she said she had no recollection of it.

That an instrument bearing the purported signature of this defendant, covering this land and in form a warranty deed, given for a valuable consideration, and delivered by defendant to her father-in-law, is established beyond substantial doubt. That diligent search has been made for it is shown by the testimony of all in whom possession might be had or imputed. In view of the acts and admissions of the defendant, and of the written memoranda, and those reasonable probabilities and presumptions applying in the business dealings had with reference to this land, we are inclined to hold the proof sufficient as to the genuineness of the purported signature of the defendant to said deed, and that the same was acknowledged by her. The reason for extreme caution in decreeing the existence of lost deeds and establishing title thereunder is to prevent fraudulent assertion of titles. But here all acts of plaintiffs and their grantors reaching back to when the circumstances of the issuance of the sheriff's deed and the deed to Ruthruff must have been recent are all consistent with good faith and the actual existence of such

instruments. The conduct of the defendant is not, but, instead, is contrary to all human probabilities, and very inconsistent with her claims so recently first asserted. The case of the plaintiff is free from any badge of fraud, and wholly consistent as pleaded and proven. The defendant's denials are easy to make but hard to believe to be the facts under all the evidence, much of which is written. Many authorities have been reviewed in weighing the facts of this case. Each case of this kind is to be dealt with largely on its own proof as one mainly of fact.

It is therefore ordered that the judgment appealed from be vacated, and that in lieu thereof a decree be entered that a sheriff's deed on foreclosure was issued and delivered June 27, 1899, as heretofore stated, and that the grantee therein, defendant Laura Louise Ruthruff, soon thereafter conveyed said land by her deed of warranty to Henry Ruthruff; that through oversight said deeds were not recorded, and have been lost or destroyed, and cannot be produced to perfect record title, but that both of said deeds are established as having existed, and that the same passed title to said tract to the Iowa Land Company, which in turn has conveyed to these plaintiffs, in whom title thereto should be and is quieted and confirmed. Judgment for costs will follow in favor of the plaintiffs and against defendant. It is so ordered.