THOMAS *et al.*

*v.*

RIBBLE *et al.*

(*Supreme Court of Appeals of Virginia, Feb. 20, 1896.*)

[24 S. E. Rep. 241.]

**Lost Deed—Proof of Contents by Parol Evidence.***

To establish title to land under an alleged lost deed, on parol testimony, proof that it existed, and of its contents, must be clear and conclusive.

Appeal from corporation court of Norfolk.

Suit by Ranney Thomas and others against Amanda C. Ribble and others to enjoin an action of ejectment. Decree for defendants. Plaintiffs appeal. Affirmed.

*Tunstall & Thom*, *Walke & Old*, and *Ellis & Kerr*, for appellants.

*Burroughs & Bro.* and *White & Garnett*, for appellees.

KEITH, P., delivered the opinion of the court.

In this case the opinion of the judge of the corporation court of the city of Norfolk, who entered the decree appealed from, is printed along with the brief of counsel for appellee. It treats the principal issue involved in a manner so satisfactory

---

*See foot-note to Corbett *v*. Nutt, 18 Gratt. 624 (Va. Rep. Anno.).

to me that I have concluded to adopt it, with slight alterations, as my opinion in this case.    It is as follows:

"This is a suit by the plaintiff and others, claiming as devisees of Eliza C. Ribble, the wife of Jos. Ribble, to enjoin the defendants, claiming as heirs of the said Jos. Ribble, from further prosecuting a certain action of ejectment for the recovery of a certain tract of land, now situated within the limits of the city· of Norfolk, but formerly in Norfolk county, and known as the 'Ribble Farm.'    This property was first conveyed by Joseph Ribble to Eliza C. Ribble (then Eliza C. Allen) in 1863, then reconveyed in 1864 by her to Joseph Ribble, with whom she subsequently intermarried.    Joseph Ribble died in 1880, without issue, leaving surviving his widow, Eliza C. Ribble, and, as heirs, certain of the parties defendant, as set out in the bill. Subsequently his widow died, leaving a will by which she devised to the plaintiffs' grantors and others all her real estate, in the interests and shares as set out in said bill and proceedings herein.    Still later the defendant Amanda C. Ribble and others, claiming as heirs of Joseph Ribble, instituted their action of ejectment against Charles F. Spotswood, the tenant in possession of the Ribble farm, claiming under the devisees of Eliza C. Ribble.    In their bill the plaintiffs admit that the apparent title to the property is in the heirs of Joseph Ribble, but, in contravention of this apparent title, allege that, after the intermarriage of Jos. Ribble and Eliza C. Ribble, Joseph Ribble, in the year 1873, made and executed to her a deed of gift of the Ribble farm, directly and without the intervention of any trustee, and that the deed, though executed and delivered, was never recorded, and has been lost or destroyed.    They therefore charge that, under the alleged lost deed of 1873, Eliza C. Ribble obtained title to the Ribble farm, which passed to them under her will, and pray that this deed may be set up and established ; their own title, as the devisees of Eliza C. Ribble, be confirmed; and that the defendant, Amanda C. Ribble, and the other defendants, claiming as heirs of Joseph Ribble, be

forever enjoined and restrained from prosecuting their action of ejectment for the recovery of the said Ribble farm.

"It will thus be seen that the main purpose of this suit is to set up this alleged lost deed from Joseph Ribble to Eliza C. Ribble, of 1873, and to establish thereunder the title in the plaintiff and others to the said Ribble farm, as devisees of the said Eliza C. Ribble. There can be no doubt of the jurisdiction of a court of equity in such cases, and no serious contention is made in this case against such jurisdiction ; so that the question here is largely, if not entirely, a question of fact. In determining that question there are, however, certain principles of the law of evidence, based largely upon public policy, which must be constantly borne in mind, in examining and weighing the testimony in this class of cases. In the first place, it may be remarked that there is, as there should be, in reason, a great difference between the degree of proof necessary to establish the loss of an instrument in writing, so as to lay the foundation for the admission of parol testimony of its contents, and the degree of proof necessary to prove its existence and loss for the purpose of setting up title under it when both are denied, and thus become the very issue in the case ; for while it is, in a certain sense, true that any proof going to show the loss of an instrument must involve to some extent the fact of its existence at one time, and tend to prove such existence, yet in the two cases the chief inquiry is directed to different questions,—in the first case, to ascertaining whether the party has used such diligence in his search for the paper as to justify parol testimony of its contents ; in the second case, to the ascertaining, as a fact in issue, whether it ever existed. In the one case we are dealing with the admissibility of testimony ; in the other, with the weight of testimony. In the first case the issue is collat-eral to the merits of the case ; in the second, it is the very issue itself upon which the parties have joined,—the merits of the case. A striking illustration of this distinction may be found in the case of Ben v. Peete, 2 Rand. (Va.) 539. That case was

decided while yet the law made a party to a suit incompetent, by reason of his interest, to testify. . There the effort was to prove by parol the contents of an alleged lost deed of manumission, and to lay the foundation for the introduction of such testimony of the contents of the deed. It was sought to prove its loss by one of the parties to the suit claiming under the deed. The court held that while he would be incompetent, by reason of his interest, to testify upon the issue directly involved, viz. the contents of the deed, yet he was competent to testify as to its loss; that being collateral to the issue in the case, and addressed to the court merely as a foundation for the introduction of secondary testimony,—a distinction which at once illustrates the difference between the character and weight of the testimony required in the two cases, and explains the principle of numerous cases found in the books where the loss of a written instrument has been held to be established upon what seems to be grossly inadequate evidence. In these cases the loss was held to be sufficiently proved only as the foundation for parol testimony of the contents.

"This brings us to the consideration of a second general principle not to be lost sight of in considering the testimony in such cases as this, where the existence of the deed at any time is denied, and that is as to the degree of evidence necessary to establish its existence and contents. Even in those cases where the proof of loss of a writing is presented only for the purpose of admitting parol testimony of its contents, the doctrine is well settled that the degree of proof necessary depends upon the character and value of the instrument in question ; less being required where it is of little value, and reasonably not carefully preserved, and more where its value would suggest the propriety of its careful preservation. So, a fortiori, where the issue involves the existence and contents of the written instrument, the doctrine would seem to be equally well founded, in principle, that the greater the value of the instrument the more conclusive should be the proof of its

existence and contents. And, where the instrument rises to
the dignity and importance of a muniment of title, every prin-
ciple of public policy demands that the proof of its former
existence, its loss, and its contents, should be strong and con-
clusive, before the courts will establish a title by parol testi-
mony to property which the law requires shall pass only by
deed or will. That courts of equity have the jurisdiction to
set up lost deeds and wills, and establish titles under them, can
certainly not be denied ; but it is a dangerous jurisdiction, and
so pregnant with opportunities of fraud and injustice that it
will not be lightly exercised, nor except upon the clearest and
most stringent proof. Mr. Williams, in his work on Execu-
tors, lays down this principle, in so many words, in respect to
lost wills, and the reason of the doctrine is equally applicable
to lost deeds. It is the policy of the law, adopted with a view
to prevent frauds, that title to lands shall pass only by written
instruments ; and the difference is more in name than in fact
between giving effect to a parol conveyance of lands and estab-
lishing a title to lands under an alleged lost deed, upon parol
testimony of its contents and loss, unless the proof be clear
and conclusive. Certainly, the opportunities for fraud are
just as great in the one case as in the other.

"So, without further discussion of authority, this court is
content to stand upon the reasonable doctrine that, to establish
title to land under an alleged lost deed, the proof of its
existence and contents must be of the clearest and most
stringent character. With this doctrine in mind, let us examine
the testimony in this case. Considering, in the beginning,
some of the general features of the testimony, we are
struck in the first place with the fact that the parties
to this alleged deed—to its preparation, execution, and ac-
knowledgment—are all dead. Grantor, grantee, scrivener,
and notary are all gone. And no attempt was ever made
to set up this alleged lost deed until after their death, though
the grantor himself lived seven years after its alleged execu-

tion, and the grantee twelve years thereafter. This may all have resulted from no fault of the parties now propounding this deed, and these facts do not, of course, defeat the plaintiffs' cause ; but they enhance greatly the difficulty of establishing it by proof, and prepare the mind to scrutinize the testimony by which it is sought, under these circumstances, to establish title adverse to the recorded title by parol evidence of the existence and contents of an alleged lost deed. And when the mind, thus already prepared to scrutinize, almost with suspicion, the testimony adduced in support of such a deed, encounters the further fact that all the witnesses who testify to the existence and contents are, either personally or in their families, the beneficiaries under the said deed, it must be conceded that the plaintiffs in such a case assume a heavy burden of proof. Next, we may observe that we are not, in this case, materially or necessarily, assisted in our inquiry by the fact, if it be one, that the testatrix, Mrs. Eliza C. Ribble, was in possession of the land, claiming it as her own, from the date of the death of Jos. C. Ribble up to the time of her own death. There is testimony here tending to show that her claim of title was under the deed of 1863, as well as evidence tending to show that she held under the alleged lost deed of 1873, and the fact of her possession is as consistent with the one theory as with the other. Again, we have to note, as one of the circumstances having a general bearing upon this case, in weighing the testimony, the unfortunate fact, already adverted to, that, of the witnesses who testify to having seen this alleged lost deed, all are themselves, or through their immediate families, the beneficiaries of this deed they are endeavoring to set up. This is an important factor in this case, for while it may be admitted that interest does not, of necessity, destroy the credibility of witnesses, yet it must be conceded that courts should move with the utmost caution in the exercise of their jurisdiction to overthrow a title established by the records and existing muniments, and to set up in its place a title under a

lost deed established by parol testimony, where that is solely the evidence of parties personally and pecuniarily interested under such alleged lost deed. And in considering such testimony the difference between a direct pecuniary interest in the witness, and the interest of love and affection growing out of the closest family ties between the witness and the party pecuniarily interested, while theoretically wide, is not, in the majority of cases, of real importance ; for the assertion may be ventured that the majority of men would falsify almost as readily to protect the interests of those dearest to them as to protect their own. Thus, while Richard L. Lee and Wilson S. Pepper, by uniting with their wives to convey their interests in the property in controversy to an adopted and own child, have rendered themselves legally competent witnesses, no one would contend that they have thereby added to their own credibility one jot or tittle more than it would have been had they been testifying in their own behalf. They are, so far as the weight to be accorded to their testimony is concerned, as much parties in interest in the one case as in the other. * * *

"It seems that in 1863, and prior thereto, the relations between Joseph C. Ribble and Mrs. Eliza C. Ribble (then Eliza C. Allen) were of the most affectionate and confiding character. It is more than probable, under the testimony, that the marriage relation which was subsequently entered into between them was even then in contemplation. Certain it is that the utmost confidence and trust existed between them. But those were troublous times, in which no man could say what the next day might have in store for him, either in respect to his person or his property. The city of Norfolk had then, for a year or more, been in the occupancy of the Federal troops. Mr. Ribble's relations to the Federal cause were such as to cause him keen apprehensions that the Federal government might confiscate his property. Naturally, he sought to protect himself against this contingency, and as naturally, it would seem, he sought

to do so by conveying it to this lady, to whom he was so deeply attached. That this was the motive of his conveyance to her in 1863 appears almost everywhere in the testimony. * * * Whether there was any consideration for it, or whether it was a mere ruse, is another question, which, while it may not be necessary to decide in this case, would yet, if it could be known, throw great light upon their subsequent transactions. * * * The probability is that this deed, though absolute on its face, was in fact made with some understanding between them as to its reconveyance, or to her holding it with some secret trust, but so as to make it appear to be really hers, and thus save it from confiscation by the Federal government. If this be the true theory, it explains some otherwise almost inexplicable transactions. If, for instance, it was a bona fide sale, induced by fear of confiscation, why should Ribble have bought it back within a year, and at a time when still, and for the same reason, he did not dare to put his deed to record, to again run the risk of confiscation ; and when, in order to avoid this danger, he had to face the almost equally great one of losing this deed by carrying it about from place to place, as the appearance indicates he did ? Again, if the deed of 1863 was the result of a bona fide sale, the repurchase of the property in 1864 was, under the circumstances, an egregious folly ; for by it he reassumes the risks he had sought to avoid, with the added danger of losing the deed. If, on the other hand, this deed of 1863 was a mere shift to avoid possible confiscation of the property, then the motives and dealings with respect to the deed of 1864 become plain and reasonable. Having been forced by stress of circumstances to convey his property to 'save it from the Yankees,' the deed had, perforce, to appear absolute on its face ; and his only possible protection was a secret understanding with the grantee, or a reconveyance. That he should therefore select as his grantee this lady whom 'he was going to marry after the war,' was but natural ; that he should have had the arrangement

include a reconveyance to himself was but the exhibition of a businesslike caution, by no means inconsistent with affectionate confidence in her.   This was by no means a perfect arrangement, but the situation was full of difficulty, and it was the best that could be done.   Should the war end, and they marry, it would make but little difference, comparatively, in whose name the property stood.   But should the war end, and she be not faithful to her trust or to him, he could, by the recordation of this deed, preserve it, and, by its production, defeat any adverse claim she might set up.   Thus, the testimony, the circumstances, and the reason of the thing, all concur in support of the idea that the deed of 1863 was a makeshift to avoid possible confiscation, and the deed of 1864 a reconveyance in pursuance of an understanding coincident with the deed of 1863, as a protection to Ribble in case of death or unfaithfulness of Mrs. Allen.   If this be true, it explains other curious circumstances disclosed by the testimony, such as that, though it was common talk in the family that Ribble had conveyed this property to Mrs. Ribble (then Allen) during the war, to preserve it from confiscation, yet no one ever heard in that family any mention at all of this deed of 1864, by which this property was reconveyed by her to Ribble.   Mrs. Ribble never mentioned this deed of 1864 to any one, and the testimony, throughout, shows that her claim to the ownership of this property was continuous at least throughout her married life.   Spotswood was an intimate visitor at the house for eight or ten years prior to Ribble's death, in 1880,—that is to say, from about 1870 or 1872,—and he 'always heard her speak of the property as hers.' * * * And so, too, Ribble's own conduct is consistent with this theory, and inconsistent with any other capable of being evolved from the testimony.   Having no children by her, he probably thought the deed of 1864 made little or no difference ; supposing, as many better-informed men do, that his wife would inherit from him if he predeceased her.   He therefore humored her claim to the property, when made in the casual way described

in the various depositions; but he had it always assessed in his name, and paid taxes on it and insured it as his own. In a word, it seems clear to the court that Mrs. Ribble never knew of the fact that the deed of 1864 had been recorded, and the title to this property revested in her husband, Jos. C. Ribble, and therefore none of the testimony as to her claiming the property generally is at all useful to the plaintiffs in their efforts to establish this alleged lost deed.

"This brings us to the consideration of the testimony bearing upon the existence and contents of the alleged lost deed of 1873. * * * There are but four witnesses who claim ever to have seen this alleged lost deed, and they are, without exception, those who themselves, or whose immediate family, daughters, sister, wives, are the parties who will take under this deed of 1873, if it is set up. The degree of scrutiny—we might almost say distrust—with which this kind of testimony in this class of cases, is to be regarded, has been already adverted to. Of these witnesses, the most important is, doubtless, Wilson S. Pepper. He, of them all, claims to have been most intimate with Mr. Ribble and his wife, Mrs. Ribble. He alone claims to have seen this alleged lost deed more than once. He, too, is one of the chief devisees of Mrs. Ribble, and, his wife being also a devisee, he, in order to be a competent witness in this case, united with her to convey their interest to their niece and adopted daughter, the plaintiff Mrs. Ranney Thomas, and yet, in his testimony, he nowhere says that Mrs. Ribble ever claimed that she held this property by reason of this alleged deed of 1873, but he does say, as Spotswood says, that she always claimed it as hers. In addition to this, I think that no unbiased mind can fail to be impressed, from his testimony,—shifting, evasive, and disingenuous as it is, throughout,—that Pepper himself, up to the very institution of the ejectment suit sought to be enjoined here, thought that Mrs. Ribble derived whatever title she had to this property under the deed of 1863, by which Ribble conveyed it to her to save

it from Federal confiscation.   Passing over his self-contradic-
tions in what may be termed the less important matters cov-
ered by his testimony, his palpable evasions when pressed upon
what seemed to him important matters, and his general shifti-
ness in giving his testimony, this fact stands out in bold relief,
—that he was astonished, yes, astounded, at the discovery of
this deed of 1864, reconveying the property to Ribble, and
divesting Mrs. Ribble of all title to it under the deed of 1863.
His whole conduct at the time of the institution of this eject-
ment suit shows this.   In vain does he try to give any other
intelligible meaning to his almost startled inquiry in his letter
to defendants' counsel—'how all this was just discovered'—
than that the existence of the deed of 1864 was a surprise to
him.   And if its existence was unknown, as it seems to the
court, to Mrs. Ribble herself, what more natural than that it
should have been unknown to him?   And if he had ever
thought that Mrs. Ribble claimed title under the alleged deed
of 1873, or that it ever had any existence, how could it be that
he did not know of some deed, after that of 1863, reconveying
the property to Ribble?   Knowing of the deed of 1863, and not
knowing of any subsequent reconveyance to Ribble by Mrs.
Ribble, he must have thought that she claimed title under the
deed of 1863, especially as her claim of title was before as well
as after the alleged deed of 1873.   In a word, it is painfully
apparent to the mind of this court that, so far as the witness
Pepper is concerned, the deed of 1873 was an afterthought,—
first brought into existence by the discovery of the deed of
1864, when the action of ejectment was brought.

   "In considering the testimony of Richard L. Lee, another
of the plaintiffs' important witnesses, it will be observed that
much of it has reference to the general claim of Mrs. Ribble
to this property ; that she never, in her husband's lifetime, at
least, said to him that she claimed it under the deed of 1873,
and never at any time said so in so many words to any one ; and
that as the deed of 1863 was well known to them all, and as,

under the testimony, it is at least extremely doubtful whether the deed of 1864 was known to her or to them, this general claim by her to the property is as consistent with the nonexistence as with the existence of the alleged deed of 1873. Again, it is abundantly evident that this witness has an exceedingly poor memory for dates. Never, by any chance, upon cross-examination, does he give the correct date ; scarcely does he approximate the correct date to any deed made to or from him on his own homestead, to say nothing of other deeds made by him ; and yet about the only thing he testifies to with absolute certainty, in regard to this alleged lost deed, is its date (1873), and he never saw this deed but once (1880), twelve years, nearly, before he testifies. Now, it must be conceded that ordinarily the date of the deed is the least impressive, as it is the least important, part of it. Yet this witness, who cannot tell the year he bought his own residence, nor the year he mortgaged it, nor the years in which he gave deeds on other of his property, 'just remembers'—without any circumstance to fix it in his mind—'just remembers' that this alleged lost deed bore date 1873. It seems to the court that it is but fair to the witness to suppose that he is 'just' mistaken in the date of the deed he saw on the occasion he alludes to ; and it is not at all unreasonable to suppose so under the circumstances of this case, as disclosed by the testimony. It seems that he went to see Mrs. Ribble upon her husband's death, and she asked him to become her surety as administratrix on her husband's estate. Upon his asking what would be his security, she showed him this deed, which he says was dated 1873. Now, it is presumable, almost to the point of certainty, that Mrs. Ribble was always in possession of the deed of 1863. The purpose for which it was made, its recordation and delivery to the 'proper party,' her claim to the property long after the deed of 1864 and prior to the delivery of this alleged lost deed,—all these circumstances lead to this conclusion. If the deed which she handed him on that occasion was in fact the deed of 1863, and

not a deed dated 1873, and he is simply mistaken as to the date,—a very easy thing to occur,—then his general description of the deed he saw would accord in other particulars substantially as well with the deed of 1863, except that he says the deed he saw was unrecorded. Now, this fact was brought out on cross-examination. It formed no part of his original description of the paper he saw, and the question confronted him with a perplexing dilemma. If he said that it had been recorded, it was clearly not the deed the parties were trying to set up, and his whole testimony became worthless. Our memories are easy, and ofttimes unconscious, slaves to our wills ; and what is more probable than that under these circumstances this witness, by an unconscious process of reasoning, rather than by act of memory, should have testified that this deed was unrecorded. Otherwise the fact that this witness, who can recall the date of no deed which was important to him, can, after the lapse of twelve years, recall with positiveness, after but one sight of it, the date of a deed not then of importance to him, presents a most unusual mental phenomenon, surpassed only by the extraordinary memory of the witness Richard K. Lee, his son. With every desire to deal gently with this latter witness, the court is constrained to say that the testimony of this witness regarding this alleged lost deed is almost incredible. Here is a young man, not even yet familiar with legal papers, who at the age of fifteen or sixteen reads a deed over once or twice, with no special object in view, but merely from casual curiosity, and undertakes eleven years afterwards to testify as to its specific contents, and even appearance, and even as to whether it bore the clerk's certificate of record,—a certificate in a form which must have been, if he had seen one, as unintelligible to him as a series of hieroglyphics. And though, upon cross-examination, he abates something of his certainty as to the precise language used, and as to the location upon the pages of certain prominent words, he yet clings with undiminished pertinacity to the state-

ment that it bore date 1873, though he read the date once, and the rest of the deed two or three times.   Now, recent occurrences have made the date of that particular deed which he saw the pivotal point in this controversy.   What has been said of the probability of the other witness, Richard L. Lee, being mistaken as to the date of the deed, and of the probability that it was 1863, and not 1873, applies with equal force to the witness.   Like his father, too, he is testifying in behalf of his own nearest kin, though, unlike him, it was not necessary for him to make a deed of his interest to render him competent as witness.

"The only remaining witness who testifies to having seen this alleged lost deed is Mrs. Mary A. Barron, the sister of Mrs. Ribble, and hence the aunt of the plaintiff, Mrs. Ranney Thomas, and the other Lee children interested in setting up this deed.   She, too, testifies to having seen this deed of 1873 ; she, too, testifies to having seen it but once, and then accidentally, twelve years prior to the time she was testifying ; and she, too, testifies with great particularity to only one thing in it, and that was its date, viz. 1873.   It would be wearisome, and can be scarcely necessary to repeat here what has been said in discussing Richard L. Lee's testimony, as to the very great probability that the deed she saw in Mrs. Ribble's possession shortly after Ribble's death was the deed of 1863, and not a deed dated 1873, but it is all equally applicable to her testimony. She, too, like Lee, without any circumstance to impress it upon her mind, just remembers that the date was 1873, because she saw it.   That is all.

"There is a singular coincidence in the circumstances under which all these witnesses, but Pepper, saw the deed.   None of them saw it but once.   None had any special reason to examine it and impress its contents upon their memories.   No two of them saw it at the same time.   Always, only Mrs. Ribble and the witness testifying were alone present.   Again, all of them, on cross-examination, show some uncertainty, some indefinite-

ness of recollection, about the other features and peculiarities of this deed, except the date. About that, none of them can be mistaken. And, withal, there is a startling unanimity of asseveration that they had not conversed with each other relative to their recollection about this deed before testifying. That these parties, all deeply interested in setting up this lost deed, and knowing they would have to rely upon parol testimony to prove it, should not at least advise themselves and each other as to what would be the extent of their testimony, is, to say the least, unusual. The possible charge of conspiracy, based upon such a conference, under such justifiable circumstance, would have carried much less weight to an impartial inquirer after the very truth of this case than their most unusual and inexplicable abstention from such conversation.

"Finally, after the most thorough, careful, and analytical examination of this testimony, and the circumstances of this case as disclosed by it, this court cannot say that the existence of this alleged deed of 1873 is established with that degree of certainty and conclusiveness required by the law in order to set up a lost deed and establish title under it, against a perfect, complete, and flawless title of record, and it must therefore decide that it never did exist.   *   *   *"

What has been said is sufficient to dispose of the principal question in issue, namely, the existence of the alleged deed of 1873. As we are of opinion that the evidence is insufficient to establish its existence, we deem it unnecessary to discuss any other question presented upon the record. For the foregoing reasons, we are of opinion that there is no error in the decree complained of, and it is therefore affirmed.