## CALVIN ROYSDON, et al. v. JOHN TERRY et al.

Middle Section.    February 5, 1927.

Petition for Certiorari denied by Supreme Court, June 11, 1927.

1. **Lost instruments. Evidence. Permitting a witness to testify from a purported copy of a lost instrument is error.**

In an action involving the establishing of a lost deed where a paper purporting to be a copy of the lost deed was handed to the witness and the witness was asked to testify whether or not the copy corresponded with his recollection of the original held to be an erroneous way to examine the witness since it is impossible to say that the witness did not testify from the purported copy instead of his independent recollection of the deed.

2. **Lost instruments. Extreme caution must be exercised in establishing lost deeds.**

The quantum of proof required to establish a lost instrument is greater as to an instrument that is a muniment of title than as to other instruments.

3. **Adverse possession. A person in possession as an adverse occupant may purchase outstanding claims.**

It is well settled that a person in the possession of lands as an adverse occupant claiming ownership may purchase outstanding claims of title from third persons without abandoning and impairing his own title or acknowledging the validity of the claim of title purchased.

4. **Adverse possession. An original owner cannot after another has acquired title by adverse possession defeat his title by selling to an innocent purchaser.**

After the adverse possession has ripened into title the original owner cannot, by taking possession and conveying the land or by conveying while the claimant is not in actual possession to a bona-fide purchaser, convey to the latter any title which could be enforced against or affect the title acquired by the adverse possession.

5. **Innocent purchaser. No priority of title by deed over title by adverse possession prior to Act of 1895.**

The provision (Shan. Code, secs. 3749-3752) that deeds shall be notice to all the world in the order of noting for registration does not give to a bona-fide purchaser without notice any priority of title over one who acquired title by adverse possession prior to the enactment of chapter 38, Acts of 1895, requiring registration of the assurance of title. It refers only to priority among parties claiming under written instruments.

6. **Limitation of actions. The statute of limitation as to title to real estate does not run until there is a valid grant of land from the sovereignty having title.**

The statute of limitation, being the first section of the Act of 1819. Shannon's Code, section 4456, does not run until there is a valid grant of land from the sovereignty having title and jurisdiction for the obvious reason that until there is a grant the title is in the sovereign or state, and the statute does not run against the sovereign.

7. **Limitation of actions. The statute of seven years applies to land forming a part of what is known as the "big survey" being land conveyed from the State of Tennessee to the State of Kentucky.**

In an action involving title to land which was a part of the "big survey" conveyed from the State of Tennessee to the State of Kentucky by the Convention of 1820, held that the seven years statute of limitations applied to this land.

8. **Limitation of actions. In Tennessee there can be no abandonment of title without an estoppel or limitation.**

The law is well settled that when a man is once seized of land, his seisin is presumed to continue until a disseisin is proved and a full legal title to land can be divested by abandonment only when the circumstances thereof are sufficient to raise an estoppel to assert title or when possession has been held for the statutory period of limitation.

9. **Estoppel. Estoppel or laches generally does not apply to the legal title of land.**

Laches will not be considered to bar legal title to land unless there is some act performed by the party which has caused a change in the condition or relation of the property or parties which makes it inequitable for the party to maintain his title.

10. **Estoppel. Evidence.**

In the instant case held that there was no proof of action which would estop the plaintiff from asserting title and the fact that plaintiffs were aware of the claim of defendant and remained silent did not operate to extinguish their right until it was barred by limitation.

Appeal from Chancery Court of Fentress County; Hon. W. R. Officer, Chancellor.

Reversed and remanded.

Ward R. Case, of Jamestown; and Fowler and Fowler, of Knoxville, for appellant, Stearns Coal & Lumber Co.

John F. McNutt, of Rockwood, for appellees, Roysdon heirs.

DeWITT, J. Complainants, as the heirs of Jesse Roysdon (who died in November, 1892), filed the bill in this cause against John Terry and Stearns Coal and Lumber Company to set up a deed from John Terry to Jesse Roydson, alleged to have been executed on March 25, 1883, to a tract of one hundred acres of land; to remove as a cloud upon the title thereto a deed of Stearns Salt and Lumber Company to Stearns Coal and Lumber Company of August 17, 1910; to enjoin the Stearns Coal and Lumber Company from further prosecuting a suit in chancery to dispossess complainants and their tenants of the land; and to have it adjudged that complainants are the owners of the tract in dispute. Terry disclaimed all interest in the land, and denied in his answer and in his testimony that he had at any time executed to Jesse Roysdon a deed for the land.

Stearns Coal and Lumber Company denied that Jesse Roysdon was at the time of his death the owner of the land, and that John Terry ever made the said deed to Jesse Roysdon. It alleged that it had had adverse possession of said land for more than seven years next before the filing of the bill. It averred that while it was in lawful and peaceable possession certain of the complainants had forcibly and unlawfully entered upon the land and were maintaining possession, hence the action of forcible entry and detainer.

The suit is therefore, in ejectment and must be determined under the rules and principles governing such cases.

The cause was heard before the Chancellor and a jury. At the

conclusion of the complainants' testimony and at the conclusion of all the evidence, the defendant, Stearns Coal and Lumber Company, moved the court for peremptory instructions in its favor, but both of said motions were overruled. · Nine propositions were submitted to the jury and were answered in favor of the complainants. Their verdict was that John Terry executed and delivered a deed, in substance the same as set out in the bill, in the year 1884; that Jesse Roysdon and his heirs after his death held adverse possession under said deed as color of title for seven years after date of the deed, the said time being before the passage of the act of 1895, requiring the registration of a color of title; that the Stearns Coal and Lumber Company and those under whom it claims had not been in the actual adverse possession of the land for more than seven years before the bill in this cause was filed. Motion for new trial was made and overruled. Motion was then made that the bill be dismissed, notwithstanding the verdict of the jury, and was overruled. Thereupon the court entered a decree establishing the deed in the language set forth in the original bill and adjudging that complainants are the owners of the said land, except a one-eighth undivided interest, which the defendant company acquired under a deed of William R. Roysdon, a son of Jesse Roysdon, to Thomas R. Lyon, dated February 15, 1900. The decree also provided that the deed under which the defendant company claimed be canceled, as to said land, as a cloud upon the title of complainant. From this decree said defendant appealed in error and its assignments of error present all the questions embodied in the motions made before the Chancellor.

The complainants rely solely on the alleged lost deed of John Terry to Roysdon, and adverse possession thereunder; and if there is no evidence to sustain the verdict as to said deed and the decree establishing it, their case must fail. We must consider solely the evidence tending to support the verdict and all reasonable inferences therefrom, disregarding all counter vailing testimony; and determine whether or not the finding has any material support.

John Terry testified that he never claimed the land, never executed the deed alleged to have been made by him to Jesse Roysdon, and that he had known the land nearly all of his life. He lived on this land during one crop season, and this would seem to have been about the year, 1883. His brother, William J. Elias Terry, made the first improvement on the land. They were nephews of Jesse Roysdon. Milt Roysdon and Nimrod Slaven testified that sometime prior to the institution of this suit they went to the home of John Terry and requested that he execute another deed to this land to the complainants as heirs of Jesse Roysdon, that he promised to go to Jamestown and do so, but he never did. Terry denied that he made such a promise. His wife testified that he never executed a deed to this land. In April, 1922, Nimrod Slaven sent a letter to John Terry in

which he declared that about eighteen months prior thereto Terry had promised him and Milt Roysdon that he would execute a deed, and requested that he do so at once. He did not comply with the request.

The testimony of John Terry and his wife was not credited by the jury, but it has been thus recited because the denial of the alleged grantor must be considered in determining whether or not the evidence tending to establish the deed complies with the standard fixed by law in the face of the denial.

The original bill contained what purported to be a substantial copy of the deed, signed and acknowledged by John Terry on March 25, 1883, before A. J. Mace, clerk of the county court. It was never registered. A. J. Mace testified that he knew Terry and Jesse Roysden; that if Terry ever acknowledged such a deed before him he did not remember it. The records of the county court clerk were burned in 1904.

Isham Roysdon, son of Jesse Roysdon, testified that he was present when the deed was written, saw John Terry sign the deed conveying to Jesse Roysdon "the land now in litigation on the headwaters of Laurel Fork in Fentress county." His answer was responsive to the question, "State whether or not you ever saw the original deed made by John Terry to your father, Jesse Roysdon?" The question was excepted to, as leading, but the exception was overruled because it was not made when the deposition was taken before the Clerk & Master. An exception to the answer as too general was overruled by the Chancellor. The witness further testified, over objection overruled, that he saw the purported copy of the deed from time to time and had it in his possession as long as six months; that Jesse Roysdon lived on this land from 1884 until his death in November, 1892; that he lived in a cabin and had two fields which were enclosed by substantial fences and cultivated.

Isaac Milton Roysdon, son of Jesse Roysdon, testified that he knew that John Terry made the deed to his father; that he, the witness, bought the land from Terry, lived on it about a year and sold it to his father; that as Terry had not made him a deed he made it to his father; that Terry and Jesse Roysdon "got together," Roysdon drew the deed and Terry signed it; that he came to town and saw Terry acknowledge it before A. J. Mace, clerk. He was asked if he had read over to him the copy of the deed in the bill, in this case. He said, "not unless the clerk read it to me a few minutes ago." Upon objection, the Chancellor directed counsel to ask the witness as to the contents. The witness then said that the deed "gave the parties and the bounds—known as the John Terry tract, it was what we called the John Terry tract of land where John Terry and Elias Terry held possession and they got it for holding possession for

Steve Pile." When asked how the land was described in the deed he said: "Just described as the John Terry tract of land, I reckon. It gave the boundaries. It commences on the Fitty rock and runs easterly, I couldn't tell the degree or number of poles, to the Dirt Rock line, my recollection is, to a maple and spruce pine, I think it is, and then it runs northeastwardly, I think, from that to the wagon road and it runs with the wagon road to the Poplar Rock House Branch and with the Poplar Rock House Branch to Doss Creek and then to the forks of the creek and with the meanders of the cliff back to the beginning. I think the deed calls for one hundred acres more or less." He testified that Terry delivered the deed to his father in 1884; that he saw the deed among the papers of W. R. Roysdon, son and administrator of his father, two or three years after the death of his father, that his father lived on the land from the spring of 1884 until his death. Calvin Roysdon, son of Jesse Roysdon, testified that his father moved on the land in the latter part of 1884 or early in 1885, and lived there until his death; that he saw the original deed purported to have been made by John Terry to Jesse Roysdon, when it was drawn and at many other times; that he had it in his possession after his father died; that he was about ten years old when the deed was written. His statement that the deed which he saw was the deed in question was made by way of affirmative answer to a question as follows:

"Did you ever see the original deed purporting to have been made by John Terry to your father for this land involved in this lawsuit." Ans. Yes, sir."

He gave none of the particulars of the contents or execution of the deed, except that Milt and Isaac Roysdon were witnesses to it.

W. H. Blevins, a farmer, Justice of the Peace, teacher, having "license to practice in the higher courts," was asked if he ever saw "the original deed from John Terry to Jesse Roysdon, a copy of which deed, or what purports to be a copy of which is copied in paragraph 3 of the original bill in this cause; if so, when did you see it, under what circumstances did you see it, and if you saw it, what became of it?"

He answered that in 1902 or 1902, he was a notary public; that Calvin Roysdon brought it to him—a deed from John Terry to Jesse Roysdon, asked him to draft a deed from it under which the other heirs of Jesse Roysdon would convey their interests in the land to him; that three sons-in-law of Roysdon refused to convey; that he read the original deed over to each of them; that it bore the certificate and seal of A. J. Mace, county court clerk. He testified that the purported copy was a substantial copy of the original deed. These questions and answers were excepted to, but the exceptions were overruled.

The same questions were propounded to the wife of W. H. Blevins and she answered that she saw the original deed when it was in the possession of her husband and that the purported copy was a substantial copy. The same objections were made and overruled.

Helen Slaven, a daughter of Jesse Roysdon, testified as follows:

"Q. Do you know anything about the deed that was made by John Terry to your father, Jesse Roysdon, to tract of land in Fentress county? A. Yes, I saw·the deed—read it—I have heard my father read it different times. I cannot remember time of writing of the deed, to be exact when it was wrote, but I have seen the deed, read it and heard it read."

"Q. I will get you to now read over what purports to be the copy of deed as appears in paragraph 3 of said bill, begin right here (indicating to witness).

(Witness examined paragraph 3 of the bill as instructed by attorney, J. F. McNutt)

A. Yes."

"Q. Is what purports to be copy of the deed a true copy of the original deed which you say you saw A. Yes."

The same objections were made and overruled.

Will Roysdon was asked if he saw a deed that was made by John Terry to Jesse Roysdon. He answered that he saw a paper that one of the boys said was a deed to the place that Roysdon lived on.

Alvin L. Terry testified that John Terry said in his hearing that he and Milt Roysdon "made a land swap and when the deed was made the deed was to go to Jesse Roysdon," conveying Jesse Roysdon's home place "over near the Dirt Rock House;" that Roysdon was giving in exchange for it a yoke of steers and a tract of land called "the Upper Round Mountain back across the creek south of there;" and that Terry said something about furnishing the money to pay for the acknowledgments to the deeds.

Louis Roysdon, a nephew of Jesse Roysdon, testified;

"Q. Did you ever hear·John Terry say anything about making a deed to Jesse Roysdon for this tract of land? A. No sir.

"Q. Did you ever see a deed of that sort, Mr. Roysdon, made by John Terry to Jesse Roysdon for the tract of land where Jesse Roysdon lived? A. Yes sir, I did.

"Q. Where was that deed when you saw it? A. It was at Catherine Roysdon's, wife of William Riley Roysdon's.

"Q. Was that before or after Jesse Roysdon died? A. After Jesse had died and after William Riley had died.

"Q. Was it acknowledged by anybody? A. Best of my recollection, it was A. J. Jack, Mace.

"Q. Do you remember what tract of land it was that was described in that deed? A. No sir. I was looking for another

deed. Campbell Smith sent me to look for a deed that was supposed to be there, and I run across this deed.

"Q. If you read it, didn't it impress on you what tract of land it was? A. I think it was this tract of land in litigation. As I wasn't interested, I was looking after another deed, I couldn't state as to the date or the description.

"Q. Are you a surveyor? A. Yes sir.

"Q. About how long after William Riley Roysdon's death was it you saw this deed? A. It was less than twelve months after he died. I couldn't tell how long. Not long after he died."

William Riley Roysdon died February 25, 1915. Complainants' witness, William J. Elias Terry, a brother of John Terry, testified that his father, Josiah Terry, made a deed to this land to Jesse Roysdon, and he never heard of any deed made by John Terry until this lawsuit was instituted.

Calvin Roysdon admitted that he occupied this land at one time under a lease from the defendant, Stearns Coal and Lumber Company.

Thomas Roysdon, nephew of Jesse Roysdon, testified that he saw the original deed from John Terry to Jesse Roysdon in the hands of Jesse Roysdon. He did not describe the contents and could not remember whether or not it had been acknowledged.

Dolly Salmon, daughter of William Riley Roysdon, testified:

"Q. State whether or not you ever saw a deed purporting to be signed by John Terry to Jesse Roysdon for the tract of land involved in this lawsuit? A. Yes sir. I saw it at home.

"Q. Before or after your father's death? A. It was after.

"Q. How long after he died? A. It was after.

"Q. How long after he died? A. Something near a year.

"Q. Did you read the deed over? A. Yes sir.

"Q. Was there any witnesses to that deed? A. I don't remember any witnesses. I don't remember what it was, just remember the deed was made from John Terry to Jesse Roysdon.

"Q. Do you remember anything about the date? A. No sir.

"Q. Do you remember anything about the description? A. Nothing only this rock they have it—a corner.

"Q. What is the beginning corner? A. A rock.

"Q. The Fittidy Rock? A. Yes, the Fittidy Rock.

"Q. Do you know what became of that deed? A. No sir.

"Q. When was the last time you saw it? A. Saw it something near—in the summer—I don't know just when it was—in 1917. The deed disappeared.

"Q. Did you put it back? A. Yes sir, I put it back where I found it.

"Q. What time was it your father died? A. February 25th 1915.

"Q. I will ask you whether or not you have made search for that deed since that time? A. Yes sir. But haven't found it.

"Q. Did you make diligent search? A. Yes sir. Made diligent search but haven't found it.

"Q. Do you know where it is? A. No sir."

The insistence that it was error to permit the witnesses to read a paper purporting to be a copy of the lost deed and to testify whether or not the copy corresponded with their recollection of the original, must be sustained. The copy was not a counterpart nor a memorandum made at the time of the original transaction nor made by any of the witnesses; it was manifestly made for the purposes of this suit. It is impossible to say that these witnesses did not testify from the purported copy instead of from their independent recollection of the deed. The witnesses were not acquainted with the copy in any way. The general rule is such a method of examination of witnesses as to the existence and contents of a lost instrument is not permissible. 8 Ency. of Ev. 358; 2 Elliott on Evidence, sect. 1476; Jaques v. Horton, 76 Ala., 238; Singer Mfg. Co. v. Riley, 80 Ala., 314; McGinness v. Sawyer, 63 Pa. St., 259; In re Gazett, 35 Minn., 532, 29 N. W., 347.

In Jaques v. Horton, supra, a case directly in point, it was said by Chief Justice Stone:

"The effect of inspecting such paper on the mind of the average witness is to obscure, or confuse, or warp the memory . . . to allow a witness under such circumstances to inspect such a paper for the purpose of refreshing his memory of the contents of the original would impair the reliability of testimony, endanger the rights of the litigant and obstruct the due administration of the law."

The spirit of the rule requiring strong, clear, cogent, and conclusive evidence as a basis for decreeing the existence of lost deeds and establishing title thereunder is due to the danger from fraud and injustice. Extreme caution must be exercised. The quantum of proof required is greater as to an instrument that is a muniment of title than as to other instruments. 17 R. C. L. 1197; 38 C. J. 281; Scurry v. Seattle, 56 Wash., 1; 104 Pac., 1128; 134 A. S. R., 1092; Lucas v. Hensley, 81 W. Va., 239, 94 S. E., 138; L. R. A., 1918 B, 1875; Shockman v. Ruthruff, 28 N. D., 597, 149 N. W., 680; Stewart v. Todd, 190 Iowa, 283, 173 N. W., 619, 20 A. L. R., 1272; Thomas v. Ribble, 2 Va. Dec., 321; 24 S. E., 241; Dagley v. Black, 197 Ill., 53, 64 N. E., 275; Tisdale v. Tisdale, 2 Sneed, 607; Johnson v. McKamey (Tenn. Chy. App.), 53 S. W., 221; Copeland v. Murphy, 2 Cold., 65; McCarty v. Kyle, 4 Cold., 348.

In Terry v. Wood, 7 Bax., 282, in which it was sought by bill in chancery to enforce a vendor's lien, the papers were lost or mislaid. Copies of the original and amended bills were obtained, and from the rule docket the dates of issuance and return of summons, and the names of parties on whom service was had, and the name of the officer executing the process were obtained, and these copies of bills and copies of the process in the case being fully set out in the record, were upon affidavits of the Clerk and Master and one of the complainant's solicitors, that the papers had been lost and that the supplied papers were substantial copies thereof, set up and allowed to be substituted for the lost originals. The objection was made that the evidence of the sheriff as to the facts of service, and his endorsement upon the summons, is better evidence than that of the Clerk and Master or the solicitor in the cause. The court held that it was not the fact of actual service of process that was to be proved under the statute for supplying lost papers or records; but it was the supplying of the papers as they existed as a record, or as a paper on file in the court; that this is done by making a substantial copy of the whole paper and the endorsements thereon and this may be done and proved by any one who is able to state the facts and it is not in the nature of secondary evidence when the party can testify as to whether the copy offered is a substantial copy of the lost paper. The opinion in this case is strongly relied upon by counsel for the appellees. But the actual existence of the original papers was not disputed; the details as to the summons were supplied from the rule docket; and the copies of the original and amended bills do not appear to have been made again from the recollection of the solicitors, but may have been duplicates or copies made at the time the originals were made. Furthermore, they were made by the parties who made the originals. Therefore, we do not follow the holding in that case as authority for the proceeding here in question. To prepare a paper purporting to be a copy of the alleged lost instrument, the very existence of which at the time is in issue, to read it to the witness and thus place before him every essential fact to be proved, asking him if said paper is a substantial copy of the original, so that he need only answer in the affirmative, is an act of placing before the witness all the information which the law rightfully requires should be elicited from his own independent recollection. We must express our entire concurrence with Chief Justice Stone in his statement of reasons for rejecting evidence so adduced. It is true that the discretion of the trial court as to the allowance of leading questions is ordinarily not reviewable, but we think that in this case a sound rule of law has been violated in letting those questions be admitted which were not justifiable.

The testimony tending to establish the deed of Terry to Roysdon consisted substantially in large part of affirmative answers to ques-

tions whether or not the purported copy was a substantial copy of the alleged deed. In our opinion it must have materially affected the verdict of the jury. All of the evidence otherwise adduced, tending to establish the deed, would have presented quite a different case to the jury in view of the rigid requirements of the law as to the quantum of evidence necessary. With the purported copy presented to the witnesses and their answers affirmatively sustaining it in response to categorical questions, the conclusion of the jury must have been readily reached when otherwise there might have been much doubt in their minds.

The defendant contends that the respective parties are claiming title from a common source, William J. Elias Terry; that complainants are estopped to dispute defendants' title; and that defendant has the better title as an innocent purchaser. The complainants deny that there was any common source of title. They rely solely on the alleged deed of John Terry to Jesse Roysdon and adverse possession thereunder.

The defendant insists that the title originated with an agreement between one S. H. Pile and William J. Elias Terry, under which Terry held possession for Pile for seven years and then received from Pile a deed, or title bond, which was never registered and was lost in the destruction of Terry's house by fire. There is no evidence of any title in Pile except a mere possessory right which he may have acquired by Terry's possession. Terry, an old man who could neither read nor write, testified with much confusion of understanding, first that Pile gave him a deed, later, that he gave him a title bond. Manifestly, this testimony, uncorroborated as it is, would be insufficient to set up a lost instrument and establish title thereunder. The evidence as to Terry's possession does not show clearly the physical nature and extent thereof and does not satisfy the requirement that title by adverse possession be established by clear and convincing testimony. It is then claimed that William J. Elias Terry made a parol conveyance to John Terry, but there is no material evidence of this, and it is clearly denied by John Terry. There is, however, another insistence as to the alleged common source of title—that complainants must be treated as relying on a deed of William J. Elias Terry, and his wife to Jesse Roysdon, dated August 25, 1889, and acknowledged on September 6, 1889. This deed was attested by Josiah Terry and William Riley Roysdon. It is urged that the taking of this deed by Jesse Roysdon was a recognition of the title of William J. Elias Terry. This deed was not registered until April, 1922. The defendant's claim of title is based upon a deed of William J. Elias Terry to William Riley Roysdon, acknowledged on December 6, 1897, dated back to March 1, 1876, and registered on February 15, 1900; upon a deed of William Riley Roysdon to Thomas R. Lyon,

dated February 14, 1900, and upon successive conveyances down to the defendant.

The deed of William J. Elias Terry and wife to Jesse Roysdon was introduced into the record by the defendant upon cross-examination of one of the witnesses for the complainants. There is no material evidence that Jesse Roysdon relied on this deed for his title. At the time of its execution he had been living on the land since 1883. If he was holding possession under the alleged deed from John Terry, he was relying upon an independent source of title. The rule of estoppel to dispute the title from a common source would not apply. Moss v. Bank, 7 Bax., 216; Hughes v. Wilkinson, 28 Miss., 600. In McConnell v. Rhodes, 14 Ga., 313, it was held that this rule would not apply where evidence of title is forced out of the claimant and is not before the court with his consent, and it does not appear that the title was derived solely from the source so evidenced or that another and better title will not be relied on. We must treat the taking of this deed by Jesse Roysdon as a mere act of improving or quieting his title by extinguishing an outstanding claim.

It is well settled that a person in the possession of lands as an adverse occupant claiming ownership may purchase outstanding claims of title from third persons without abandoning and impairing his own title or acknowledging the validity of the claim of title purchased. Newell on Ejectment, 738; Blight v. Rochester, 7 Wheat. (U. S.), 535; Jackson v. Given, 8 Johns. (N. Y.), 137, 5 Am. Dec., 328; Jackson v. Smith, 13 Johns. (N. Y.), 406; Northrop v. Wright, 7 Hill (N. Y.), 476; Chapin v. Hunt, 40 Mich., 595; Parker v. Proprietors, etc., 3 Met. (Mass.), 91, 37 Am. Dec. 121; Hays v. Martin, 45 Calif., 559; Cannon v. Stockton, 36 Calif., 535; Owens v. Meyers, 20 Pa. St., 134, 57 Am. Dec., 693; Bannon v. Brandon, 34 Pa. St., 263; Brandon v. Bannon, 38 Pa. St., 63; Lodge v. Patterson, 3 Watts (Pa.), 74, 27 Am. Dec., 385; Coperton v. Gregory, 11 Gratt. (Va.), 505.

We do not assume that Jesse Roysdon had a good title in 1889, when he obtained this deed, for the seven years had not elapsed; but he was an adverse possessor, as found by the jury, and we are treating this question as if the jury's verdict must stand. The claim of William J. Elias Terry was for no more than a possessory right, and his possession had terminated long before that time—so that his deed could not convey any substantial title. He testified that prior to that time he gave to William Riley Roysdon a title bond, but William Riley Roysdon was a witness to the deed to Jesse Roysdon in 1889, and there was before the jury evidence that William Riley Roysdon, who lived on the land with his father for four years before his father's death, continued to live on it for two or three years

after his father's death, holding possession for himself and the other heirs of Jesse Roysdon.

Although we hold that the parties are not claiming under a common source of title, we must yet determine whether or not the defendant has the superior title as a bona-fide purchaser without notice, under sections 3749-3752 of Shannon's Code. It is insisted that the defendant is a purchaser without notice within the meaning of said statutes. While this question does not seem to have been determined in any of our reported cases in Tennessee, it is manifest that these statutes refer to priority among parties claiming under written instruments. There is no provision in our laws giving to such bona-fide purchaser without notice any priority of title over one who acquired title by adverse possession under section 4556 of the Code, prior to the enactment of Chapter 38 of the Acts of 1895, requiring the registration of the assurance of title as a basis of acquiring title by adverse possession. The rule is set forth in 2 C. J. 235, that after the adverse possession has ripened into title the original owner cannot, by taking possession and conveying the land or by conveying while the claimant is not in actual possession, to a bona-fide purchaser, convey to the latter any title which could be enforced against or affect the title acquired by the adverse possession—citing Faloon v. Simshauser, 130 Ill., 649, 22 N. E., 835; East Texas Land Co. v. Shelby, 17 Tex. Civ. App., 685, 41 S. W., 542; McGregory v. Thompson, 7 Tex. Civ. App., 32, 26 S. W., 649; Western Canada Loan Company v. Garrison, 16 Ont., 81; Ridgeway v. Holliday, 59 Mo., 444; Schall v. Williams Valley Railroad Co., 35 Pa., 191.

In Ridgeway v. Holliday, supra, it was said:

"But it is contended by the defendant that he is a purchaser for value from Voteau, who appeared from the record to be the owner, and was in possession, without any notice of the prior adverse possession which passed the title to Ridgeway or of any claim on his part to the premises; and that as against him the defendant, Ridgeway, cannot assert his title; that to permit him to do so would be giving to an adverse possession greater force and efficacy than is given to an unrecorded conveyance. These objections, it must be admitted, are very forcible. The registry act cannot, however, in the nature of things apply to the transfer of legal title by adverse possession, and such title does not stand on the footing of one acquired and held by an unrecorded deed, and of such title the purchaser may not expect to find any evidence in the record."

In Schall v. Williams Valley Railroad Company, supra, the same principle was set forth as follows:

"Titles matured under the statute of limitations are not within the recording acts. However, expedient it might be of

requiring some public record of such titles to be kept, and however inconvenient it may be to purchasers to ascertain what titles of that sort are outstanding, still we have not such legislation on the subject, and it is not competent for judicial decision to force upon them consequences drawn from the recording acts. Those acts relate exclusively to written titles. Possessory titles have always been favorites of Pennsylvania legislation and it would ill become the judiciary to clog them with conditions and disabilities, which the law making power had not prescribed, nor even suggested.''

Applying the rule based upon these cogent reasons, we are of the opinion that the defendant cannot invoke the provisions of the aforesaid statutes and claim as an innocent purchaser over a title acquired by the ancestor of the complainants by adverse possession prior to the enactment of the aforesaid act of 1895.

The defendant contends that it was error for the court to admit in evidence a certified copy of a patent issued by the State of Kentucky on Land Office Warrant No. 630, to a large tract of land called the ''Big Survey,'' including the land herein involved, lying between the parallel of thirty-six degrees thirty minutes, called the Matthews' line, and the boundary line settled between the said states in 1820, by a convention providing that all lands lying within said boundaries should be the property of and subject to the disposition of the State of Kentucky, and that any grant she might make therefor should be received in evidence in all the courts of law or equity in the State of Tennessee, and be available to the party deriving title under the same. (2 Haywood & Cobb, p. 229; Poole v. Fleeger, 11 Peters, 184, 9 L. Ed., 680; Sharp v. Van Winkle, 12 Lea, 15; Parker v. Claiborne, 2 Swan, 565). The copy of said patent was a copy certified by the Register of Fentress county as a copy of said patent certified by the proper officials of the State of Kentucky. It is insisted that no authority exists for the registration of a copy of a Kentucky patent and therefore, there was no legitimate evidence that the land involved had been granted, and no title thereto could have been acquired by the adverse possession proven. It is, of course, the rule that the statute of limitation, being the first section of the Act of 1819, Shannon's Code, sect. 4456, does not run until there is a valid grant of land from the sovereignty having title and jurisdiction for the obvious reason that until there is a grant the title is in the sovereign or State, and the statute does not run against the sovereign. Sharp v. Van Winkle, 12 Lea, 19; Shannon's Code, sect. 4456. It is insisted that no statute has ever been passed providing that copies of the Kentucky patents may be obtained and recorded in Tennessee and copies of said records of such copies may be introduced in evidence. This proposition is answered by the con-

tention that the land was granted by the State of Tennessee to the State of Kentucky under the Convention of 1820, and therefore, the introduction of the Kentucky patent was not necessary.

In Sharp v. Van Winkle, supra, it was distinctly held that the lands provided for by the fifth section of the convention between Kentucky and Tennessee (the section in which the cession or grant was made) were "granted by this State" to the state of Kentucky, and fall within the purview of the statutes of limitation of the code. In Campbell v. Crockett, 8 Yerg., 225, Chief Justice Catron, in his opinion, said that the Act of 1819 does not apply to grants made by Indian treaties in the form of reservations, or to school sections, or to grants by Virginia east of the Cumberland Mountains, or to a large number of grants made by Virginia, and especially by Kentucky west of the Cumberland Mountains and east of the Tennessee River, lying south of Walker's line but north of 36 degrees 30 minutes north latitude, provided for by the fifth, sixth and seventh article of the compact of 1820, between Kentucky and Tennessee; but in Sharp v. Van Winkle, the court held that this statement, so far as it was authorized by the provisions of the statute itself or then existing law, was a mere dictum, the court having already decided that the state had no power to grant the particular land in 1803, and that the defendant was protected by the Act of 1797. The question was reconsidered, the facts directly raising it, and the court held, as aforesaid, that the statute of limitation of seven years did run against the state of Kentucky. The court said that it was never contemplated that lands held under titles derived from the states of Virginia and Kentucky should not come within the provisions of a general law expressly passed to quiet titles by adverse possession for a limited period of time; that it is only by adhering to the letter of the statute, giving the words used a very restrictive meaning, that a different conclusion can be reached; that the reason why the words of the statute, "granted by this state or the state of North Carolina," were used was, that the statute might not run against the State; but it would not exist where the State had already parted with its interest in the land, granting it in fact, in any mode. This holding is conclusive of the question before us, for in the deeds introduced by the defendants in this cause, the land herein involved is described as a part of the "Big Survey," which is described therein as bounded on the north by the present Kentucky and Tennessee State line, on the south by the Matthews' line, or parallel of 36 degrees 30 minutes north latitude, and therefore, a part of the lands thus granted by the State of Tennessee to the State of Kentucky in the convention of 1820. The question was therefore set at rest by the decision in Sharp v. Van Winkle, and it affirmatively appears, without looking to the copy of the Kentucky patent, that the land had been granted by the State of Ten-

nessee and the statute of seven years would run in favor of Jesse Roysdon and his heirs.

It is insisted that the complainants have been guilty of such gross and inexcusable laches in the presentation of the claim to this land, and their course of conduct has been so inconsistent with their present contention, that they are estopped to assert that the title to the land in controversy was in their father, Jesse Roysdon, through whom they claim, instead of in their brother, William R. Roysdon, through whom the defendant claims. We must dispose of this proposition as if the verdict establishing the lost deed would be effective, for this contention was presented with the motion to dismiss notwithstanding the verdict of the jury.

There is evidence that adverse possession of this land was maintained in behalf of the complainants, not only by their ancestor, until his death in 1892, but also until the close of the year, 1899. There is also evidence that the deed of John Terry to Jesse Roysdon was in the possession of the widow of William Riley Roysdon, the administrator of the estate of Jesse Roysdon, as late as the year 1916. It is insisted that the first intimation of the claim of the land by the complainants came to the defendant when they undertook to take possession of the land in January, 1922; that during more than twenty years the complainants had lived in and about the neighborhood where the land lies, and that the defendant, Stearns Coal and Lumber Company, had agents and tenants looking after the land and making some kind of improvements on it. The jury found that neither the Stearns Coal and Lumber Company, nor its predecessors in title as far back as February, 1900, the date of the deed of William R. Roysdon to Thomas R. Lyon, had been in the actual adverse possession of the land. It is urged that while the jury so found the finding was based upon the insufficiency, and not upon the non-existence, of such possession; and that it is not within reason that any of the complainants were without knowledge of the conveyance by William R. Roysdon to Thomas R. Lyon, and of the subsequent transfers of the land.

The law is well settled that when a man is once seized of land his seizin is presumed to continue until a disseizin is proved. Newell on Ejectment, 421. In Coal & Iron Company v. Schwoon, 145 Tenn., 224, it was said that it is difficult to conceive of such a thing as an abandoned title in Tennessee under previous decisions of the Supreme Court; that in order to justify the conclusion that there has been an abandonment there must be some clear and unquestionably affirmative act indicating the purpose of repudiating the ownership. It was further held that a full legal title to land can be divested by abandonment only when the circumstances thereof are sufficient to raise an estoppel to assert title, or when possession is acquired by

one in consequence of the abandonment and held under a claim of right for the statutory period of limitations; that when there is no estoppel or limitation there can be no abandonment that will affect the right of the holder to the legal title—citing Phy. v. Hatfield, 122 Tenn., 696, 126 S. W. 105; 135 Amer. St. Reports, 888, 19 Ann. Cases 374; Tennessee Oil Company v. Brown, 131 Fed., 696. See, also, East Tennessee Oil Company v. Williams, 68 Fed., 419.

Generally, where the issue is as to the legal title the statute of limitation controls and the question of laches cannot arise. 21 C. J., 231. In 21 C. J., 230, the rule is stated that the doctrine of laches does not apply where the defendant has acted in open and known hostility to plaintiff's rights and has been misled by no apparent acquiescence on plaintiff's part; that in such case no consideration of good faith requires that plaintiff should open the legal warfare at the very earliest opportunity. The rule as stated by the Supreme Court of the United States, in two leading cases, is that laches is not, like limitations, a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or parties. Galliher v. Caldwell, 145 U. S., 368, 36 L. Ed., 738; Penn. Mutual Life Ins. Company v. Austin, 168 U. S., 685, 42 L. Ed., 626.

In Parker v. Bethel Hotel Company, 96 Tenn., 252, the underlying reasons for the rule were ably set forth and applied. It was said that a court of equity will not enforce stale demands where a party seeking its aid has slept on his rights and acquiesced for an unreasonably long time, that laches is always discounted; but delay alone unaccompanied by other circumstances will not necessarily preclude relief; that where the situation of the parties has not been altered and one had not been put in a worse condition by the delay of the other, the defense of laches does not generally apply.

Abandonment, or laches unaccompanied with other facts constituting an estoppel would therefore not be available as a defense to a claim under a legal title.

In Morris v. Moore, 11 Humph., 435, the requisites of an estoppel that would repel a person relying on a legal title were declared to be as follows:

> "To maintain the equitable estoppel the plaintiff must be able to show, by averments and proof, that he had been injured by the deceptive and fraudulent conduct of the defendants, and considering that the effect of the rule is to take away the right of the true owner, by acts in pais, and to confer it upon the plaintiff, who has purchased of a person having in fact no title, the case should be very fully and distinctly made out, to justify the application of the principle."

In Tennessee Coal, etc., Company v. McDowell, 100 Tenn., 565, the owner of land who had acquired title by seven years adverse possession, under a conflicting junior grant, was held to have estopped himself to assert that title, pro tanto, by knowingly permitting the senior grantee, or those claiming under him, to cut off and sell a portion of the land thus held to an innocent party, who had in good faith taken possession and paid the price, or otherwise incurred obligations about the land. In that case there were affirmative acts of recognition of the conflicting title.

In the case before us there is no proof of any overt acts of acknowledgment by the complainants, of the title of the defendant; nor of their aiding or encouraging the defendant or its predecessors in title, in making any improvements or otherwise altering their position or suffering any injury. Even if the complainants were aware of the claim of defendant, their mere silence would not operate to extinguish their rights. Estoppel by silence arises only where a person who by force of circumstances is under a duty to another to speak and refrains from doing so, thereby leading the other to believe in the existence of a state of facts in reliance upon which he acts to his prejudice. 21 C. J., 1061. It is not a case where, if a man is silent when he ought to speak, equity will debar him from speaking when conscience requires him to be silent. It is intimated that complainants appear to have participated in the proceeds of the sale of William Riley Roysdon to Thomas R. Lyon; but there is no substantial proof thereof. The interest of William Riley Roysdon in this land passed to Thomas R. Lyon under his deed and is not involved in the litigation. We are of the opinion that the complainants are not barred by laches or estoppel to assert their claim of title to this land.

The propositions presented in the motion for peremptory instructions and the motion for dismissal notwithstanding the verdict of the jury, and which are included in the assignments of error, have been thus disposed of in this opinion. But in our opinion the error of allowing the purported copy of the alleged lost deed to be read to the witnesses was so material and must have so vitally affected the verdict of the jury that the decree of the Chancellor must be reversed and the cause remanded for a new trial. It will be so ordered. The costs of the appeal in error will be adjudged against the complainants. The costs accruing in the chancery court will abide the final decree of said court.

Faw, P. J., and Crownover, J., concur.